THE BROADWAY MANUFACTURING COMPANY, *Appellant*, V. THE LEAVENWORTH TERMINAL RAILWAY AND BRIDGE COMPANY *et al., Appellees*.

No. 15,474.

#### SYLLABUS BY THE COURT.

1. JURORS—*Qualifications—Resident Taxpayers—Action against a City.* Where there is no difficulty in procuring jurors whose impartiality is unquestioned, it is material error to retain upon the trial panel resident taxpayers of a city against whom a judgment is sought, and the fact that other corporations, whose liability depends upon the same state of facts, are joined as defendants does not change the rule.

2. WATERCOURSES — *Obstruction by a Bridge — Extraordinary Freshet.* An instruction that the builder of a bridge over a stream is required to leave openings for the passage of all the water reasonably to be expected to flow therein gives the proper measure of his duty. To add thereto a statement that no liability can attach for the results of an unusual rain or an extraordinary freshet, without further explanation, tends to mislead the jury.

3. ——— *Duty of Builder of Bridge to Anticipate Overflow.*

The duty of the builder of a bridge over a watercourse to avoid obstructing it does not end with making provision for the escape of so much water as can be carried within the channel; if there is reason to anticipate that the stream will at times overflow its banks he must also, if practicable, provide an outlet for the flood water.

4. PRACTICE, SUPREME COURT—*Materiality of Errors—Code of 1909 Construed.* The provision of the new code (Laws 1909, ch. 182, § 581) that reversals shall not be ordered for errors which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining, when it appears that substantial justice has been done, does not authorize the affirmance of a judgment upon the ground that it is in accordance with the view of the facts which the reviewing court itself might derive from the conflicting evidence, where it is based on a verdict rendered under the apparent influence of a materially erroneous instruction or by a jury made up in part of persons disqualified on account of interest.

Appeal from Leavenworth district court; JAMES H. GILLPATRICK, judge. Opinion filed February 12, 1910. Reversed.

*Charles Hayden, J. C. Petherbridge,* and *Arthur M. Jackson,* for the appellant.

*F. P. Fitzwilliams, O. J. Wood, John H. Atwood, W. Littlefield,* and *W. W. Hooper,* for the appellees.

The opinion of the court was delivered by

MASON, J.: Property of the Broadway Manufacturing Company was injured by water overflowing from Three Mile creek, in Leavenworth, on the night of July 5, 1904. The company claimed that the overflow was caused by two bridges over the stream, one belonging to the city and the other to the Leavenworth Terminal Railway and Bridge Company, and by a trestle-work viaduct of the Leavenworth & Topeka Railway Company extending along the bed of the stream between the two bridges. It sued the owners of the three structures for substantially $20,000, alleging that all were negligently constructed. A general verdict was ren-

dered for the defendants, and the plaintiff appeals from the judgment rendered thereon.

One hundred and ninety assignments of error are made, mainly relating to the admission and rejection of evidence and to the giving and refusal of instructions. We think it unnecessary to examine them in detail, since some are of doubtful importance and others relate to matters not likely to arise again. A number of instructions asked covered substantially the same ground, presenting in slightly different language the plaintiff's theory of the law. The only questions thought to require determination are whether certain jurors were competent and whether the trial court gave a correct measure of the duty of the defendants with respect to the quantity of water for the passage of which they should have provided in bridging the stream.

Several of the jurors who served in the case were residents and taxpayers of the city, and were retained over the challenge of the plaintiff based upon that ground. Here, as in most other jurisdictions where the question has been passed upon, such persons are held to be disqualified to try an action against the municipality. (*Gibson v. City of Wyandotte,* 20 Kan. 156; 24 Cyc. 271; 17 A. & E. Encycl. of L. 1133; 9 Am. St. Rep. 750.) In this state the rule has almost the force of a statute, since after being announced by the supreme court it has stood unchallenged for thirty years. There would be much less reason for holding that in an action against a county residents thereof are incompetent as jurors, because then a practical difficulty would be encountered, since this would necessitate a change of venue. But all question in that connection has been set at rest by the statute making them eligible. (Gen. Stat. 1901, § 1609.) True, an individual taxpayer is but slightly affected by the rendition of a particular judgment against a city, but so far as it may serve to encourage other actions his indirect interest

may be considerable. At all events the propriety of a change in the practice in this regard is a matter for legislative, not for judicial, inquiry. The joinder of the three defendants in one action was not capricious or vexatious on the part of the plaintiff, but natural and commendable. Inasmuch as the claims against the other defendants were substantially the same as that against the city, any bias in its favor was a reasonable ground for at least a challenge "to the favor" upon the issue between them and the plaintiff; they had no right to insist upon the retention of jurors open to suspicion of prejudice, and the fact that they were made parties could not change the rule as to the municipality. No reason is suggested for supposing that the smallest difficulty would have been experienced in obtaining a jury from other parts of the county whose impartiality would have been beyond question. The retention of the challenged jurors must be regarded as material error.

One instruction defining the duty of the defendants read in part as follows:

"I instruct you that it was the duty of the defendants in the construction of the bridges or culverts across Three Mile creek to provide and maintain an opening or openings for the natural flow of the waters of said creek sufficient to afford an outlet for all of the waters that might reasonably have been expected to flow from this watercourse, and this with reference to such freshets as might reasonably have been expected."

This is substantially the test which has been recently approved by this court. (*Railway Co. v. Herman*, 74 Kan. 77.) But these instructions were added:

"Where a city, under the superintendence of a competent engineer, builds a culvert or bridge sufficient to discharge the ordinary quantity of water during low and high water, flowing through a definite channel between defined banks, it is not liable when, because of a flow caused by an unusually heavy rain, the banks of said stream are overflowed.

"If you believe from the evidence that the storm of July 5, 1904, was an extraordinary storm, and that

such bridge of the city of Leavenworth at Seventh street was suitably constructed so as to let the waters of Three Mile creek pass with reasonable freedom at all times, except in case of extraordinary freshets, then you should find for the defendants.

"Nor was said company [referring to each of the defendants, other than the city] required to anticipate extraordinary and unusual storms."

These additional instructions are open to criticism because they seem to be a limitation upon that already given. They convey a correct or an erroneous idea according to the meaning attached to the words "unusual" and "extraordinary." If an "extraordinary" freshet is understood to be one so outside of ordinary experience that its occurrence was not reasonably to have been anticipated, that word is not misleading. It is often so used by the courts and text-writers (30 A. & E. Encycl. of L. 375, 376; 3 Words & Ph. Jud. Def. p. 2628; 59 L. R. A. 877; 6 L. R. A., n. s., 252) ; but in the absence of a specific direction to do so a jury might easily fail to give it that force. "Unusual" is hardly a strong enough expression to carry the same significance. Both words are so vague that as used in the instructions quoted they serve to obscure rather than to illuminate the preceding statement of the proper test.

The statement of the rule as to the quantity of water for the passage of which provision must be made was still further limited by the addition of these words in the same instruction: "not, however, beyond the capacity of the stream; that is, the volume of water that could be confined within its banks." And in this connection the jury were further told that:

"The channel of a river, creek or stream is that part of such river, creek or stream which has on either side of said channel well-defined marks, evidencing the ordinary flowing of water therein; that is, the banks on either side of a channel are those which show evidence of being worn by the constant or frequent flowing of water in said channel, and it does not include any part

of said banks upon which ordinary vegetation, such as grass and weeds, grow.

"If the bridges in question are of sufficient capacity to carry all the water which can flow within the ordinary well-defined channel of said Three Mile creek, then and in that case the defendants would not be liable for any damage caused by water which overflowed the banks thereof.

"The defendants, nor either of them, were in law required to construct any of the bridges in question of such size or dimensions as would accommodate and permit the flow of surface water, and with this question in mind I instruct you that waters which have overflowed the banks of a stream during high water or a freshet, in consequence of the insufficiency of the channel to hold and carry them off, are surface waters."

These instructions seem open to the interpretation that the defendants in building their bridges were bound to allow room for the passage of only so much water as could be contained within that part of the watercourse where the flow was so nearly constant as to prevent the growth of vegetation. So construed they are inaccurate and misleading. The defendants were required to provide for the passage of at least so much water as could be carried between the banks of the stream, whether they were denuded of vegetation or not, if the flow of such an amount was reasonably to have been anticipated. Evidence was introduced tending to show that Three Mile creek had a well-defined channel, the banks of which were bare only up to a certain point. The verdict may therefore have been influenced by this narrow view of the defendants' obligation. But we conclude that in this respect the charge was erroneous and probably prejudicial, even assuming that taken as a whole it means that the defendants were required to allow for the passage of so much water as could be contained between the banks of the stream to their full height, regardless of the growth of vegetation thereon, but for no more. There are cases intimating and even expressly holding that whenever the banks of

a stream are overflowed the surplus becomes at once surface water—a "common enemy," against which any one may protect himself. The great weight of authority, however, supports the view that it is to be so regarded only in case it has ceased to be a part of a general current following the channel; that if it continues to flow in the same direction while outside of the banks, returning thereto upon the subsidence of the flood, it is to be deemed a part of a running stream, and that it only loses its character as such when it spreads out over the open country and settles in stagnant pools or finds some other outlet. The question is fully discussed in sections 879 and 880 of volume 3 of Farnham's Water and Watercourses, and the cases bearing upon it are collected in a note by that author in 25 L. R. A. 527, 531. More recent cases are: *Fordham v. Northern Pacific Ry. Co.*, 30 Mont. 421, *Uhl v. Railroad Co.*, 56 W. Va. 494, and *Clark v. Guano Co.*, 144 N. C. 64. (See, also, Gould, Waters, 3d ed., § 264.) A full note upon a related subject appears in 22 L. R. A., n. s., 789, which contains references to earlier notes in the same series. It is not necessary, however, to decide how the term "surface water" should be used, nor what are the respective rights of persons affected with reference to waters properly so designated. As was said by Mr. Farnham in the note referred to:

"To make the rights with reference to flood water of a river depend upon whether or not it is surface water is useless. The only safe course is to treat flood water as a class by itself and then determine the respective rights according to the character of the flood." (25 L. R. A. 530.)

Much the same thing has already been said by this court:

"There is a suggestion that the overflow of the stream is to be treated as surface water, and that the company can not be held liable for injury resulting from such water. If the water was thrown back upon the riparian owner because of the obstruction of the

channel of the stream, it is immaterial by what name it is designated." (*Railway Co. v. Herman,* 74 Kan. 77, 81.)

Cases on the duty of one building a bridge over a watercourse are collected in a note in 59 L. R. A. 862. The duty is thus stated in *Union Trust Company v. Cuppy,* 26 Kan. 754, 756:

"A railroad company in constructing its road over a natural watercourse is required to leave such openings as are sufficient to afford an outlet for all water (from whatever source it may come, and in times of floods and freshets, as well as at other times,) which may reasonably be expected to flow through such watercourse." (Syllabus.)

This duty springs from an obligation to refrain from inflicting any needless injury upon another. If when a bridge is about to be constructed the probabilities are that the stream to be crossed will at times overflow its banks there is as much occasion to provide an outlet for the surplus water as for that which is confined within the channel. Where the adjacent lands are no higher than the banks it may be impractical to provide an opening any larger than the channel itself or to avoid presenting some obstruction to the passage of flood water. But where the ground rises as it recedes from the stream, and especially where there are secondary banks, the capacity of the wider channel so formed must be taken into account. The record does not disclose the precise conditions in this regard in the present case.

The defendants invoke the provisions of the new code relating to appellate practice (Laws 1909, ch. 182, § 581) and maintain that even if errors were committed in the impaneling of the jury and the giving of instructions they do not warrant a reversal, because they do not affirmatively appear to have prejudicially affected the substantial rights of the plaintiff and upon the whole record the judgment appears to have done substantial justice. To whatever extent the revised code

may have changed the former procedure, it has not deprived litigants of the right of trial by jury—and this implies the right to have conflicts in the evidence resolved by impartial jurors under proper instructions. If the jurors are prejudiced against one of the parties or are erroneously directed to disregard his theory of the law in a material matter, and a verdict is returned against him upon conflicting evidence, his substantial rights have necessarily been prejudiced—he has been denied a fair hearing before the tribunal provided by the constitution. For this court to undertake under such circumstances to say what verdict unbiased jurors would have reached under instructions correctly defining the question they were to pass upon would be to substitute its own judgment for that of the jury—a result we can not believe to have been contemplated by the framers of the recent legislation.

In discussions of the need of reform in judicial procedure it has often been said that a judgment should not be reversed unless the reviewing court can affirmatively say that except for the error complained of a different decision would have been reached at the trial. It has been suggested that the new code should be interpreted as adopting this criterion. The practical difficulty with such a view is that it is seldom possible to say with confidence what influence a particular ruling upon a vital matter may have had upon a verdict. When a jury is informed that certain facts constitute a defense to an action a general finding for the defendant ordinarily gives no clue to what its decision would have been if it had been instructed to the contrary. It is sometimes assumed that the test proposed is practically that of the English courts in administering the statutes which provide that new trials shall only be granted for error which has occasioned some substantial wrong or miscarriage (36 & 37 Vict. ch. 66, § 48; Law Jour. 1873, p. 221), and that criminal appeals may be dismissed when notwithstanding trial errors

no substantial miscarriage of justice has actually occurred. (7 Edw. VII, ch. 23, § 4, subdiv. 1.) That the fact is otherwise is illustrated by the language of several recent cases. In *Hunt v. Star Newspaper Company, Limited,* L. R. (1908), 2 K. B. Div., 309, a new trial was ordered on account of an erroneous instruction, the reason being thus stated: .

"The direction . . . was so expressed as to bear a meaning which might have misled the jury and affected their verdict, and as it was a general verdict . . . we have no alternative but to send the case back for a new trial, because it is impossible to say to what extent the verdict may have been influenced by such misdirection." (Pages 321, 322.)

In a similar case (*Dakhyl v. Labouchere*) printed as a note to that just cited, it was said:

"In all cases it [the ordering of a new trial] is a most deplorable result, not to be entertained upon any but the most solid grounds, as the only means of redressing a clear miscarriage. In the present case I regret it all the more, because the amount of the verdict seems to indicate that the jury took the plaintiff's view of the facts. But I can not reconcile myself to allowing a verdict to stand when I am convinced that the opinion of the jury was not really taken on two vital points on which the defendant was in law entitled to insist and did insist." (Page 327.)

A criminal case reported in the same volume (*Rex v. Dyson,* p. 454) states these grounds for a reversal:

"There having been a misdirection, the question arises whether the court can nevertheless dismiss the appeal . . . upon the ground that no substantial miscarriage of justice has actually occurred by reason of the conviction. The proper question to have been submitted to the jury was whether the prisoner accelerated the child's death by the injuries which he inflicted in December, 1907. . . . And if that question had been left to the jury, they would in all probability have found the prisoner guilty on that ground. . . . But it is one thing to say that the jury on a proper direction would probably have so convicted; it

40—81 KAN.

is another to say positively that there has been no substantial miscarriage of justice. . . . We can not substitute ourselves for the jury and find the facts which are necessary to support the conviction. The proviso is intended to apply to a case in which the evidence is such that the jury must have found the prisoner guilty if they had been properly directed. It does not apply where the evidence leaves it in doubt whether they would have so found." (Pages 456, 457.)

Of course, rulings upon matters of minor importance, even although technically incorrect, may well be disregarded when it is reasonably clear that no serious prejudice has in fact resulted. But where it appears probable that a misdirection upon a vital matter has affected the verdict there seems no course open but to order a new trial, although it can not be said with absolute certainty that had proper instructions been given a different decision would have been reached.

It is true that here the evidence fairly established that the high water of July 5, 1904, was almost without precedent—that no greater flood had occurred since 1865. To hold the defendants responsible for failing to foresee and provide against such an unusual volume of water would be undeniably rigorous. But there was testimony fairly tending to show that the bridges did not provide an outlet for all the water at times of more usual freshets. A natural conclusion from all the evidence would be that the volume of water was so great that even if there had been no bridges all the ground in the vicinity would have been flooded. But the jury found that the defendants' bridges did not adequately provide for the passage of the waters of the creek at the time of the freshet that occasioned the damage complained of, and that their inadequacy in this respect caused or materially contributed to the injury to the plaintiff's property. This finding makes it seem probable that the general verdict resulted from the narrow view taken by the trial court of the duty of the defendants.

The defendants suggest that the statute of limitations began to run against the plaintiff's claim when the bridges were built, and that therefore the bar had fallen before proceedings were begun. The cause of action here sued upon did not accrue until the flooding of the plaintiff's property. (*Union Trust Company v. Cuppy*, 26 Kan. 754; 5 L. R. A., n. s., 381, note; 25 Cyc. 1146.)

The judgment is reversed and a new trial ordered.