C. M. RIDDLE et al., *Appellees*, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Appellant*.
No. 17,816.

ANDREW J. THOMAS, *Appellee*, v. THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, *Appellant*.
No. 17,818.

SYLLABUS BY THE COURT.

1. WATERCOURSE—*Obstruction by Railroad Bridge—Floods.* A railroad company in carrying its railroad over a watercourse and the approaches thereto must provide sufficient outlets not only for the ordinary flow of water but also for the escape of water in times of floods which may reasonably be expected to occur.

2. ——— *Same.* Provision need not be made for unprecedented floods which could not reasonably have been foreseen, but whatever the term by which a flood may be designated, if such floods have occurred frequently at irregular intervals it is reasonable to expect that they will occur again, and those who place obstructions in the watercourse should provide for the escape of such flood water.

3. ——— *Same.* If from the history of the stream and the knowledge and experience of those who first constructed a railroad and the embankments on which it rested the outlets and openings first made for the escape of water then appeared to be sufficient, it would still not relieve the company from liability for injuries arising from a later flood when floods of a like character have occurred from time to time through a series of years since the construction of the road and it has been demonstrated that such floods may reasonably be expected.

4. ——— *Same.* Water which overflows the banks of a river and then flows down a natural depression in the same general direction as the river runs and which returns to the river upon the subsidence of the flood is to be deemed a part of the running stream.

5. EVIDENCE—*Sufficient to Show Obstruction.* The testimony examined, and held to be sufficient to support the finding that the water which caused the injury and loss was thrown and held upon appellees' lands through the failure of appellant to provide suitable and sufficient outlets through the embank-

ments upon which its railroad rested for the escape of flood water arising from heavy rainfalls which should have been anticipated and provided for.

Appeals from Marion district court. Opinion filed. December 7, 1912. Affirmed.

*M. A. Low,* and *Paul E. Walker,* both of Topeka, for the appellant.

*Frank Doster,* of Topeka, and *W. H. Carpenter,* of Marion, for appellees C. M. Riddle *et al.*

*D. W. Wheeler,* and *W. H. Carpenter,* both of Marion, for appellee Andrew J. Thomas.

The opinion of the court was delivered by

JOHNSTON, C. J.: These were actions brought by the appellees against the Chicago, Rock Island and Pacific Railway Company to recover for injury and destruction of their crops alleged to have resulted from the negligent construction of embankments and bridges on which appellant's railroad was placed. The Cottonwood river flows from west to east through a level valley in Marion county and drains a large scope of country. In 1888 appellant constructed its railroad from north to south across the valley at nearly right angles with the river. The line of the Atchison, Topeka and Santa Fe Railway Company was constructed from east to west parallel with and about nine hundred feet north of the river. The lands of appellees lie west of appellant's railroad and north of the Santa Fe railroad, in the northwest angle formed by the two railroads. The valley is low and wide at this point and both railroads are constructed on embankments of earth. The point where appellant's bridge is built across the river is higher than any of the lands in the valley for a considerable distance in either direction, and the abutments of the bridge are about one hundred and nineteen feet apart. The land slopes from

the bridge towards the southeast and the embankments on which appellant's railroad is laid vary in height, the average height south of the bridge being between seven and eight feet, and north of the bridge it ranges from two to fourteen feet. About one-half mile south of the bridge the railroad intersects a swale, or depression, which begins about three and one-half miles up the river and at a low place in its bank, and runs in a southeasterly direction, connecting with Spring Branch, which runs into the river below the city of Marion. When there is high water the overflow from the river passes down this swale into Spring Branch and reunites with the water in the main channel of the river. On July 10, 1909, a heavy rain fell in that section which caused the river to overflow and run down the swale and against the embankments of appellant's railroad, and the claim is that because of insufficient openings in the embankments the water was held and finally thrown north across the river and over the Santa Fe embankment, inundating the appellees' farms. For a time the water extended from bluff to bluff, across the valley, and was approximately a mile and a half wide. The angle in which appellees' lands are situated filled up with water, and it was contended, because the appellant did not provide sufficient outlets for the water through its embankments, that the flood water was held on appellees' lands for several days, destroying their crops. In answer to special questions the jury found that the openings at the bridge and in the embankments approaching it were insufficient to accommodate the flow of flood water and that appellant's embankments prevented the flow of flood water from appellees' lands, causing the damage of which complaint is made. By their verdict the jury awarded the appellees $1400 as damages in one case and $900 in the other.

In this appeal it is contended that appellant was

not negligent in the construction of its bridge and embankments, because the flood of 1909 must be regarded as unusual and extraordinary, one not to be anticipated. The testimony was to the effect that there was a flood in 1877, but that the flow of water was then unobstructed and hence little damage was done. Floods did occur in 1899, 1900, 1901, 1903, two in 1904 and one in 1906, followed by the one in question. That of 1900 was so high that the water stood three feet deep in the streets of Marion, and that of 1903 was so great that the water covered the valley and flowed over appellant's embankments and washed out its track, while that of 1906 washed out appellant's embankment at the swale. After each of the floods of 1903 and 1906 the appellant raised its embankments. Following the flood of 1903 the appellant placed one sixty-inch pipe and one forty-eight-inch pipe through its embankment at the swale, and after the 1906 flood an opening sixty feet wide was made at that place. Since the flood of 1909, the one in question, the appellant dug a ditch along its track near appellees' lands, about thirty-seven feet wide and twelve feet deep, which carries off the water from the lands of appellees. At the bridge the channel of the river from bank to bank is two hundred and sixty-six feet wide, while the opening at the bridge between the piers or abutments is only one hundred and nineteen feet wide. Testimony was given to the effect that the residents of the valley, after the flood of 1877, anticipated a recurrence of them, and buildings and streets were raised considerably above the former levels.

The contention that the history of the river and of that section of the country demonstrates that the flood of 1909 was unusual and extraordinary is answered by the evidence and the findings and verdict of the jury. The fact that the flood was unusual and out of the ordinary does not necessarily relieve the

appellant from liability. In *Kansas City v. King,* 65 Kan. 64, 68 Pac. 1093, the same contention was made, but the court held that while a flood might be regarded as unusual, yet if floods occurred again and again at irregular intervals it was only reasonble to anticipate that they would occur again, and hence it was the duty of those obstructing the flow of water to make provision for such floods. In *Railway Co. v. Herman,* 74 Kan. 77, 85 Pac. 817, where damages were sought because of the obstruction of a stream, it was said:

"The test of liability, however, is not whether the rainfall was unusual or extraordinary, but whether it was such as might have been reasonably foreseen by bringing to the building and maintenance of the bridge such engineering knowledge and skill as is ordinarily applied to such work. In the minds of some a freshet is neither usual nor ordinary, but since they do occur occasionally, and may reasonably be expected to occur, provision should be made for them." (p. 79.)

The same view was taken in *Union Trust Company v. Cuppy,* 26 Kan. 754, and *Manufacturing Co. v. Bridge Co.,* 81 Kan. 616, 106 Pac. 1034.

In *O. & M. Ry. Co. v. Ramey,* 139 Ill. 9, 26 N. E. 1087, it was said:

"The question, then, is not whether appellant has sufficiently provided for the escape of water of ordinary floods, but, has it provided for the escape of the water of such unusual or extraordinary floods as it should have anticipated would occasionally occur in the future, because they had occasionally occurred after intervals, though of irregular duration, in the past." (p. 13.)

It matters little what term is applied to a flood, and it may be that a flood such as has occurred at intervals for a number of years and which it is reasonable to expect will occur again should not be designated as extraordinary, but whatever name is given to it a liability will arise against one whose obstruction causes the overflow and injury if he was in fact.

bound to anticipate and provide against such a flood. Here there had been nine floods, and in some of them the rainfall was as great and the water as high or higher than that of 1909, and in view of the frequency of the floods, as well as the topography of the country, it was fairly a question for the jury whether the flood of 1909 was one to be reasonably anticipated and provided for. In constructing its embankments and bridge appellant was required to exercise reasonable care to provide outlets for the uninterrupted flow of water in its accustomed channels. What is due care is the degree that an ordinarily prudent man would exercise, and in respect to the 1909 flood the question is, would a prudent man have anticipated and provided for it? It may be that the flood of 1877 alone did not require appellant to anticipate that the like would occur again, but when these floods were repeated so many times it can not be held that the jury had no basis for their findings that the floods should have been anticipated and provided against. Even if the knowledge and experience of the engineers who planned the road when it was built had led them to believe that the openings first left in the embankments were sufficient, that would not prevent liability if the floods occurred so frequently thereafter that appellant had reasonable grounds to anticipate that they would occur again. If the recurring floods demonstrated that the outlets for water were insufficient, it then became the duty of appellant to make additional provision for them. Indeed, the appellant did make additional openings after some of the floods, but it appears that those made were inadequate to carry off the superabundant water which had flowed through the valley before and which it was reasonable to expect would flow again.

Another contention is that the flood water which passed down the swale against the embankments of

appellant, and was thrown back upon appellees' lands, should be regarded as surface water, which may be obstructed without liability. There is a diversity of opinion whether the overflow of a stream is to be considered as a part of the watercourse or as surface water which may be obstructed without responsibility, but in recent decisions this court has held that overflow water which leaves the main channel and flows down a natural depression, presently to return, as in this instance, is to be treated as a part of the stream, and that those placing bridges or embankments across such watercourse are bound to provide an outlet for the overflow that is reasonably to be anticipated. In *Manufacturing Co. v. Bridge Co.*, 81 Kan. 616, 106 Pac. 1034, it was said:

"There are cases intimating and even expressly holding that whenever the banks of a stream are overflowed the surplus becomes at once surface water—a 'common enemy,' against which any one may protect himself. The great weight of authority, however, supports the view that it is to be so regarded only in case it has ceased to be a part of a general current following the channel; that if it continues to flow in the same direction while outside of the banks, returning thereto upon the subsidence of the flood, it is to be deemed a part of a running stream, and that it only loses its character as such when it spreads out over the open country and settles in stagnant pools or finds some other outlet." (p. 621.)

The same rule was applied in *Roland v. Railway Co.*, 82 Kan. 546, 108 Pac. 808, and other supporting authorities are: *Fordham v. Northern Pacific Ry. Co.*, 30 Mont. 421, 76 Pac. 1040; *Uhl v. Railroad Co.*, 56 W. Va. 494, 49 S. E. 378; *Clark v. Guano Co.*, 144 N. C. 64, 56 S. E. 858; *Town of Jefferson et al. v. Hicks*, 23 Okla. 684, 102 Pac. 79; *Chicago, B. & Q. Rld. Co. v. Emmert*, 53 Neb. 237, 73 N. W. 540; 40 Cyc. 639; and 3 Farnham on Waters and Water Rights, § 879.

Although it is contended that the bridge and em-

bankments did not cause the injury and the loss for which appellees sought a recovery, there is testimony tending to show that but for the obstructions made by the appellant the loss would not have been sustained. On what appears to be sufficient testimony the jury, in effect, found that because of appellant's embankments being without sufficient openings the overflow water was backed up and forced north across the Santa Fe track and upon appellees' lands. There is a conflict in the testimony as to whether the water was thrown there by that obstruction or came upon the land from other sources, but the finding of the jury settles that conflict. According to the evidence given in behalf of appellees the water was forced back on appellees' lands by the obstruction at the swale, and then because of the lack of sufficient outlets at the bridge and through the embankments north of the river the water was held on the land long enough to injure the crops and cause the damage for which these actions were brought.

Complaint is made of the fifth instruction given to the jury, but it is in consonance with the ruling in *Manufacturing Co. v. Bridge Co.*, 81 Kan. 616, 106 Pac. 1034, a ruling which is followed in this decision. The sixth instruction, to which objection is made, also appears to be within the rules already stated. The seventh instruction interpreted literally would appear to be in conflict with the rules stated in the fifth instruction. The jury were told that "a swale, slough or depression which carries water only in time of floods or excessive rainfall is not a watercourse the obstruction of which by a railroad embankment without openings will render the company liable for damages." The jury found, in answer to special questions, that the swale south of the river did not carry anything but surface water under ordinary circumstances, nor any water from the river except at such times as when

the river overflowed its banks. Taken out of its connection with the other portions of the charge, the instruction would appear to be erroneous, but if it be error it is one in favor of appellant. The court probably meant that a swale or depression like the one in question, which only carries water in times of flood or heavy rainfall and which has no defined channel or permanence of flow, can not be regarded as a watercourse subject to the ordinary rules in regard to the obstruction of watercourses. A different rule applies, however, where the swale carries the overflow water which leaves the main channel of the river and flows through the swale in the same general direction as the river, and which returns to and reunites with the river when the floods subside, and this distinction was recognized by the court in other instructions given. Considered in connection with the findings and other parts of the charge it can not be said that the jury were misled by this instruction, and in any event it is clear that the appellant could not have suffered any prejudice on account of it.

Some other criticisms are made of the charge, but we find no material error in it, nor any ground for reversal. The judgment is affirmed.