Thompson v. McDougal.

---

No. 21,622.

CHARLOTTE C. THOMPSON, *Appellant,* v. D. D. McDOUGAL et al., *Appellees.*

### SYLLABUS BY THE COURT.

FLOOD WATER—*Through Break in River Bank—Levees to Guard against Overflow of Land—Injunction.* Where plaintiff negligently permits a break in the natural bank of a river to occur and exist on her land, refuses to mend it, and obstinately and without good excuse refuses to permit her defendant neighbors to mend it, her unreasonable and inequitable attitude is such that she is not entitled to an injunction to restrain the defendants who suffer from flood waters escaping through such break from maintaining a levee on their own land, which levee is designed only to turn back into the river at a lower point in its channel the volume of water which escapes through the break in times of high water and which flows therefrom through plaintiff's land on to defendants' lands, although such levee may delay and retard the flow of such escaping water over plaintiff's land.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed July 6, 1918. Affirmed.

*A. M. Jackson,* and *A. L. Noble,* both of Winfield, for the appellant.

*C. L. Swarts,* of Arkansas City, *J. E. Torrance,* and *O. W. Torrance,* both of Winfield, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff owns a farm in the Walnut river valley in Cowley county. The defendant McDougal owns the next farm to the south. The other defendants are neighbors south and southeast of McDougal. The plaintiff sued to enjoin the defendants from maintaining a levee or dike on McDougal's land designed to turn water into the Walnut river which escapes through a break in the natural river bank on plaintiff's land and which flows through the plaintiff's land in a southerly direction on to the land of defendant McDougal and there spreads out to the south and east over the land of McDougal and others. Part of this water turns westward into a channel of the Walnut river, which, after flowing westward through plaintiff's land, makes a wide irregular sweep further west and then curves back to the southeast and enters the western edge of McDougal's land.

There is a long elliptical depression, locally called a bayou, extending north and south between the point where the river breaks through its bank on plaintiff's land and the point where the river returns from the west to enter defendants' land. The east side of this depression or bayou furnishes a waterway for part of the water escaping from the river which flows through Thompson's land on to McDougal's. At the southern base of this bayou or depression the defendants have constructed a levee or dike about 700 feet long and from a few inches to thirty inches high, the purpose of which is to turn all the water westward into the river and to prevent it from flooding defendants' lands to the south and southeast. The levee will turn all the water which comes through the break in the river bank on plaintiff's land. The break is some 20 feet wide and 8 feet deep. But the levee is wholly ineffective to protect, and not designed to protect, defendants' lands from heavy floods which frequently overflow the banks of the Walnut river and inundate that community. The latter sort of floods would pass over and around the levee and probably would destroy it.

Plaintiff's grievance is that, whereas before the defendants' levee was constructed the water which comes through the break in the river bank would run off from her land in about 48

hours on to defendants' lands and do her little harm, now the same volume of water takes about 70 hours to drain off, and this delay ruins her crops.

The trial court heard the evidence and viewed the premises, and made findings of fact and denied the injunction. The most significant of the trial court's findings read:

"X. . . . The water coming down the east fork of the bayou across the plaintiff's and McDougal's land will follow the bayou into the river, and before breaking across the south bank of the bayou and spreading over the land south thereof it will be flowing into the Walnut river at its shallowest depth between three and four inches deep and several feet wide. . . .

"XI. The defendants assisted the plaintiff at one time to repair this break in the bank of the Walnut river. Such break has been filled in a number of times, just how often the evidence does not show. About five years ago this break again washed out and the plaintiff has declined to repair or permit the same to be repaired. The defendants and others requested of the plaintiff the right to make a repair on this break which the plaintiff refused, and gave as a reason for his [her] refusal that such repair would cause injury to other neighbors. At each rise in the river the break becomes greater and each year increasing portions of the flood water pass through said break upon the plaintiff's and defendants' lands.

"XII. After the plaintiff declined to repair or permit the break in the bank to be repaired the defendants on or about the — day of April, 1916, constructed a dike along the south bank of the bayou about thirty inches high at its highest point and about 700 feet long for the purpose of preventing the water in ordinary floods from breaking out over the south bank and spreading over the defendants' land, and to turn the same back into the channel of the Walnut river. This dike in no way affects any flood waters except such as flow through the break of the river bank on the plaintiff's land.

"XIII. This bayou and the island formed thereby is partly on the plaintiff's and partly on the defendant McDougal's land, practically all of which is farmed with different kinds of crops, and all of which can be protected from an ordinary flood or high water by a permanent repair of this break in the bank."

Plaintiff contends that the levee is maintained in violation of section 4050 of the General Statutes of 1915, which forbids a lower landowner to obstruct "the flow of surface water on to his land to the damage of the adjacent upper owner"; and plaintiff relies on the cases of *Mo. Pac. Rly. Co. v. Keys,* 55 Kan. 205, 40 Pac. 275, and *Singleton v. Railway Co.,* 67 Kan. 284, 72 Pac. 786, to support her position that the flood waters coming through the break in her river bank are to be considered as surface waters. When those cases were decided, the law of

this state permitted a lower landowner to repel surface waters; and while it forbade, as it still does, any landowner to dike against the natural flow of flood waters to the detriment of others, it did permit a landowner, with due regard to the rights of others, to build dikes and barriers to protect his property from overflow and waste. (*Parker v. City of Atchison,* 58 Kan. 29, 36, 48 Pac. 631.) The rights and limitations of rights of landowners in dealing with flood waters. were not changed, nor attempted to be changed, by chapter 175 of the Laws of 1911 (Gen. Stat. 1915, §§ 4050-4052), unless, indeed, they have been somewhat enlarged by section 2 of the act:

"Owners of land may drain the same in the general course of natural drainage, by constructing open or covered drains, whereby the water will be carried into some natural watercourse, or into any drain upon a public highway, for the purpose of securing proper drainage to such land and when such drainage is wholly upon the owner's land he shall not be liable in damages therefor to any person or persons or corporation. . . ." (Gen. Stat. 1915, § 4051.)

To regard flood waters escaping from a river as surface water led to little or no confusion before the enactment of 1911, but it may sometimes do so now.

In *Manufacturing Co. v. Bridge Co.,* 81 Kan. 616, 621, 622, 106 Pac. 1034, decided after the statute of 1911 was enacted, it was said:

"There are cases intimating and even expressly holding that whenever the banks of a stream are overflowed the surplus becomes at once surface water—a 'common enemy,' against which any one may protect himself. The great weight of authority, however, supports the view that it is to be so regarded only in case it has ceased to be a part of a general current following the channel; that if it continues to flow in the same direction while outside of the banks, returning thereto upon the subsidence of the flood, it is to be deemed a part of a running stream, and that it only loses its character as such when it spreads out over the open country and settles in stagnant pools or finds some other outlet. . . .

"As was said by Mr. Farnham [in a note by him in 25 L. R. A. 527]:

" 'To make the rights with reference to flood water of a river depend upon whether or not it is surface water is useless. The only safe course is to treat flood water as a class by itself and then determine the respective rights according to the character of the flood.' (25 L. R. A. 530.)"

(See, also, *Railway Co. v. Herman,* 74 Kan. 77, 81, 85 Pac. 817.)

It cannot be said that the flood water which defendants seek

Thompson v. McDougal.

to control by the levee is ordinary surface water. It is river water—flood water, water which but for the negligence, indifference and obstinacy of plaintiff would never reach or concern the defendants. The attitude of plaintiff is glaringly inequitable. She will not mend her river bank, nor permit it to be done by defendants, although to do or permit this to be done would save her own property harmless, as well as that of defendants. Her excuse, "that such repair would cause injury to other neighbors," is not an excuse which a court of equity can tolerate. Her "other neighbors" can look out for themselves, and it is no injury—no legally redressible injury—to them to endure the natural flow of high waters to which the location of their lands may subject them; and the plaintiff may not relieve them of their natural disadvantages to the damage and injury of defendants; and certainly she will get no affirmative aid in a court of equity to further such purpose. Plaintiff does not come into court in that just and equitable attitude herself which is a prerequisite to entitle her to discretionary relief at the hands of a court of equity. (*Freeman v. Scherer*, 97 Kan. 184, 189, 154 Pac. 1019.)

The defendants had the right to drain and turn this water back into the river, a natural watercourse. (Laws 1911, ch. 175, § 2, Gen. Stat. 1915, § 4051.) If plaintiff were free from negligence and obstinacy touching the repair of the river bank, and if she came into court in an equitable mood herself, the defendants would not be permitted in the maintenance of their levee to retard the flow of the water over plaintiff's land; but where parties are in equal wrong equity declines relief. Here the wrong of plaintiff is greater than any wrong of defendants, and consequently she is still less entitled to consideration in equity.

Error is assigned in the trial court's refusal to make certain findings alleged to have been established by the proof, and in making certain others not thus established. These have been duly considered, but none of them are important. The trial court refused to find that the levee retarded the flow of water over plaintiff's land. Perhaps the court did not believe the evidence to that effect, and the court's personal view of the situation and premises may have entered into its denial of that finding. The findings quoted in this opinion were supported by

evidence, and they control this case. So long as the levee is insufficient to retard or delay the flow of other or greater flood waters than those which escape only through the break in the river bank negligently and obstinately maintained by the plaintiff, she is not entitled to have defendants' levee abated.

The judgment is affirmed.