James STAFOS, Appellant,

v.

MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellee.

MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellant,

v.

James STAFOS, Appellee.

Nos. 7818, 7829.

United States Court of Appeals
Tenth Circuit.

Oct. 17, 1966.

Robert H. Bingham, Kansas City, Kan. (Lee E. Weeks, Leonard O. Thomas, J. D. Lysaught, Wash H. Brown and Donald H. Corson, Jr., Kansas City, Kan., with him on brief), for James Stafos.

Ralph M. Hope, Wichita, Kan. (W. F. Lilleston, George C. Spradling, Henry V. Gott, George Stallwitz, Ronald M. Gott, Glenn D. Young, Jr., Edward H. Graham, Wichita, Kan., Willard L. Phillips, Patrick B. McAnany, Thomas M. VanCleave and James J. Lysaught, Kansas City, Kan., with him on brief), for Missouri Pacific Railroad Co.

Before MURRAH, Chief Judge, PICKETT and HILL, Circuit Judges.

MURRAH, Chief Judge.

In this diversity suit the railroad company appeals from a judgment of the Kansas Court in favor of the appellee-farmer for crop damages in 1961–62 due to the overflow of impounded waters proximately caused by the negligent maintenance of the railroad's bridge, ditch and roadbed. The cross-appeal complains of the amount of the award for compensatory damages and the failure to award any punitive damages.

The appellee's leased land lies between the railroad right-of-way on the south and the Missouri River on the north. A leveed ditch commencing near the east corner of the appellee's land runs in an easterly direction parallel to the railroad tracks past other farm lands not involved here and ultimately to the Missouri River. This leveed ditch was constructed in 1938 to receive runoff from a watershed across the railroad tracks to the south. The drainage from the rather hilly watershed (consisting of approximately 200 acres) empties into a ravine running northerly toward the railroad passing under a bridge or culvert on a state highway, thence 500 feet to another bridge on a county road, thence approximately 25 feet to the railroad bridge, thence through the railroad ditch to a point where it turns abruptly into the leveed ditch near the corner of appellee's leased land. From there the water is channeled through the leveed ditch eastward to the river. The major portion of the leased land, lying northwest of the ravine and parallel to the railroad, is thus unprotected by any drainage ditch.

The specific claim sustained by the trial court is that the railroad negligently permitted silt and debris to collect in its bridge and ditch forming a dam causing

flood waters to leave the ravine and become impounded behind the railroad bed west of the ravine and leveed ditch; that the overflow was of such force and velocity as to permeate the roadbed causing it to "wash out" and flood a portion of appellee's leased premises and the crops growing thereon.

The trial court proceeded on the perfectly valid premise that the railroad was under a legal duty to construct and maintain a suitable bridge, appurtenant ditch and roadbed to accommodate the foreseeable runoff from the watershed tributary to the ravine. See Niccum v. Atchison, T. & S. F. Ry. Co., 147 Kan. 645, 78 P.2d 1; Riddle v. Chicago, R. I. & P. Railway Co., 88 Kan. 248, 128 P. 195; Broadway Manufacturing Company v. Leavenworth Terminal Ry. & Bridge Co. et al. 81 Kan. 616, 106 P. 1034, 28 L.R.A., N.S., 156.

The railroad's defense was that the maintenance of its bridge, ditch and roadbed was not the proximate cause of the overflow and resultant damage; that in the first place the rainfall for the crop years in question was extraordinarily heavy in this vicinity—far greater than the 30 year average—and the flooding was, therefore, unforeseeable; that in any event the flooding was caused by the obstructions on the upstream side of the county road bridge approximately 25 feet south of the railroad bridge and by a natural mound on the west and a manmade dike on the east side of the ravine which diverted the water over the west bank of the ravine where it became impounded behind the roadbed without reaching the railroad bridge. In short the defendant's theory is that the flood was extraordinary and unforeseeable and that the flood waters would have overflowed the ravine to the north and west and become impounded as they did even if the railroad bridge had not existed and the ditch had been a clear channel at that point. The railroad also contends that the impoundment and overflow was caused in part at least by the failure of the lessee-appellee to maintain his portion of the leveed ditch in proper condition to channel the water which passed under the railroad bridge into the ditch.

The court found and concluded that although the rainfall during the years in question was greater than any preceding 30 year period, it was nevertheless within the range of foreseeability. The court specifically found that as a result of the clogged and silted condition of the railroad's bridge and ditch, runoff from heavy rainfall on July 6, September 13 and October 12, 1961, and October 12, 1962, backed up in its natural water course until it overflowed the west banks south of the county road bridge in a northwesterly direction and a substantial portion overflowed south of the railroad bridge in a westerly direction, ultimately pounding against the railroad tracks and roadbed for a distance of several hundred feet west of the railroad bridge; that the flood waters rose to such a height as to cause the water to overflow the railroad tracks and permeate the gravel roadbed washing it out in several places thereby precipitating the impounded waters onto appellee's lease land with such force and velocity as to inundate and flood a portion of it and the crops thereon; that at the time of the three floods in 1961 the county roadbridge was partially obstructed by silt and debris, but after the flood of October 12, 1961, the county cleaned it out; that although thereafter and prior to the flood of October 12, 1962, the opening was again partially obstructed by silt and debris, it "continued to have a considerable opening", and after the flood of October 12, the bridge had an opening on its upstream side of 19.4 square feet and on its downstream side of 29.3 square feet. The court further found that after the first flood in 1961, the railroad was notified of the damages claimed to have been suffered by appellee by reason of such flooding but refused on written request to remove the obstructions or to permit appellee to do so.

The court found that after each of the floodings the appellant replaced the washed out portions of its roadbed with

gravel or chat and that each flooding washed out the gravel and chat in approximately the same places; that during all this time the appellant knew that the gravel was not impervious to the impounded waters caused by the silted condition of the railroad ditch and the obstructed bridge.

On these findings the court concluded that the railroad was guilty of negligence proximately causing appellee's damages by failure to keep and maintain its bridge, ditch and roadbed so as to provide for the free flow of water down, through and under its bridge into a properly constructed channel with sufficient capacity to carry the waters reasonably to be expected to flow therein.

The railroad challenges these critical findings and conclusions as wholly unsupported by the record evidence. The contention is that they are contrary to undisputed expert testimony to the effect that the condition of its bridge and ditch in no way contributed to any of the floodings complained of. The railroad did introduce credible expert proof that if its bridge had been non-existent and the ravine at that point a clear channel, the waters that fell on the watershed would have overflowed the ravine south of the county road bridge and become impounded as they did west of the railroad bridge for the reasons (1) that the ravine south of the county road bridge was incapable of delivering to the bridge the volume of water which fell on the watershed on the dates in question; (2) that the dike on the east side of the ravine effectively prevented excess water in the ravine from flowing eastward, thereby forcing all or most of the overflow toward the west into the area where the damage occurred; (3) that the opening in the county road bridge was incapable of delivering to the vicinity of the railroad bridge the volume of water flowing into the ravine on the critical dates; (4) that the ravine or ditch south of the railroad bridge had been altered " * * * by manmade appurtenances so as to affect its natural operating characteristics * * * "; and (5) that the portion of the leveed ditch parallel to the leased premises was incapable of delivering the water without flooding the adjacent areas.

■■ There was no scientific proof to the contrary, and it is true, as we have said, that controlling, positive, uncontradicted and unimpeached evidence may not be disregarded even though adduced from interested witnesses, and in such circumstances the trier of the fact is bound to honor it. See Potucek v. Cordeleria Lourdes, 10 Cir., 310 F.2d 527; Security-First National Bank of Los Angeles v. Lutz, 9 Cir., 322 F.2d 348. If, indeed, the evidence—expert or non-expert—is all one way, there is no room for a contrary finding. But, expert evidence does not foreclose lay testimony concerning the same matter which is within the knowledge and comprehension of the lay witness. A lay witness may tell all he knows about a matter in issue even though it may tend to impugn the conclusions of the expert. See Padgett v. Buxton-Smith Mercantile Company, 10 Cir., 262 F.2d 39, 41; Boston Insurance Company v. Read, 10 Cir., 166 F.2d 551, 553, 2 A.L.R.2d 1155; Cf. Potucek v. Cordeleria Lourdes, supra; and see generally 20 Am.Jur., Evidence, § 1208, p. 1061.

No one seems to seriously question the fact that the water which fell on the watershed on the critical dates flowed into the ravine and overflowed its banks in a west and northwesterly direction to the point where it became impounded behind the railroad embankment west of the railroad bridge; that the impounded waters rose to such height that they overflowed the tracks and permeated the roadbed causing the waters to overflow the leased land to appellee's damage. Competent proof is also conceded to the effect that the railroad bridge and ditch were at least partially obstructed and the amount of water passing through "was not great". The railroad offered positive expert proof in support of its hypothesis, however, to the effect that regardless of the bridge and regardless of its condition, it " * * * could not have been more than a minor contributing factor." But, there was creditable proof that at

the time of each of the floodings in question the railroad ditch and bridge were clogged with silt and debris and that water backed up behind the bridge and overflowed the ditch between the two bridges.[1]

■ The only question for decision here then is whether the evidence was sufficient to support the trial court's finding that the obstruction in the railroad bridge resulted in the impoundment of a sufficient quantity of water to constitute a concurrent contributing cause of the overflow and consequent damage to appellee's leased lands and crops. It is not essential to the railroad's liability that the obstruction of its bridge and ditch be the sole and only cause of the

flooding. It is enough if it is one of the efficient and procuring causes. The degree of negligence is unimportant. See McClave v. Moulton, 10 Cir., 123 F.2d 450, 452; Knox v. Barnard, 181 Kan. 943, 317 P.2d 452; Kendrick v. Atchison, Topeka & Santa Fe Railroad Co., 182 Kan. 249, 320 P.2d 1061.

■ Under the proof in this case we cannot say that the court's finding to the effect that the negligent obstruction to the bridge and ditch caused a substantial amount of water to overflow the west bank proximately contributing to the flood damage is clearly erroneous. Nor can we reject as clearly erroneous the court's finding and conclusion to the effect that the railroad negligently used improper materials in the construction

1. An eyewitness to the October 12, 1962, flood testified, " * * * as I was coming across the railroad track in the truck, the water was filling up between the County Road Bridge and the [railroad] bridge. Q. All right, sir. Now, where were you when you saw this? A. In the truck. * * * Q. Now, what was the condition, if you observed it, of the upstream, or south side of the Railroad Bridge? A. Well, the water was coming down. Q. By coming down, what do you mean? A. Coming down under the County Road Bridge into the—* * * —between the two bridges. And the water didn't seem to be moving out, is how come me to notice it. Q. Now, did you observe the condition of the downstream side or north side of the Railroad Bridge? A. Yes, sir. Q. And, what was the condition of that? A. Well, there was some water there, not very much. Q. Was it standing or was it moving? A. No, it was standing. Q. Standing. Now, I am not sure you said this, did you—did you observe the [upstream] side or south side of the County Bridge? A. Yes. Q. And, what was the condition of that bridge and the ditch underneath it? A. The water was moving there. Q. Was moving? A. Yes sir." He further testified that when he returned to the scene about an hour later, " * * * there was a bunch of logs * * * sticking up next to the Railroad Bridge. Q. On which side? A. On—it would be on the south side. So, I went down there. And we tried to move these logs, but we was unable to do so. * * * Q. At the time you were trying to move the logs, what was the condition of the

south side of the Railroad Bridge? A. Well, the water was—there was a lot of water there. Q. Did you observe the condition of the north side of that bridge? A. Yes, sir. Q. And what—can you describe what you saw? A. Well, there was still a lot of water on the north side of the bridge. Q. Was the water that you saw on the north side standing or moving? A. It was just the same, it wasn't moving. Q. At that time, did you observe the condition of the downstream or northerly side of the County Bridge? A. Yes. Q. Did you describe—can you describe what you saw there? A. There was just water there. Q. Was it, to the best of your recollection, standing or moving? A. Well, to the best of my knowledge, it's hard to say, cause the water was coming underneath the culvert, and it was full, the hole was full there. Q. The hole, you mean the— A. The ditch between the two bridges. * * * Q. At this particular time when you were down in this area, and I believe after you said you had tried to move these logs, was there any water over the County Road? A. No, sir. I turned around on the bridge." On cross-examination the witness testfied in part, "Q. O.K. As I understand it, * * * you said there was no water going over or on the farm entrance south of the railroad track? A. It was the second time. Q. Where was that located? A. It was between the railroad tracks and the junction where you turn into the farm. Q. From—you said this ditch, which do you mean? A. The ditch between the two bridges."

and maintenance of its roadbed at the points of the repeated floodings.

The railroad strenuously complains of the court's findings of negligence with respect to the construction of its bridge and ditch and the construction and maintenance of its roadbed on the grounds that such negligence was not properly pleaded and was not, therefore, a triable issue in the case. There was evidence of the use of chat and gravel in the repair of the roadbed which permitted permeation and wash out by the flood waters. From this the trial court apparently inferred faulty repair of the roadbed, and we cannot say that the inference is wholly unjustified. This evidence was introduced over the continuing objection of the railroad. At the conclusion of all the evidence, the appellee was permitted, again over the objections of the railroad, to amend his pleadings to conform to the proof.

 The pre-trial order supersedes the pleadings, and as we read the pre-trial order it is not confined to the narrow scope of the pleadings. It defines the issue as whether the appellant was guilty of negligence proximately causing appellee's damages, the amount thereof, if any, and whether if appellant was guilty of negligence the appellee was guilty of contributory neligence. It simply covers everything and touches nothing, hence the triable issues were as broad as the proof. Moreover, the amendments of the pleadings to cover the proof were deliberately allowed and plainly within the discretion of the court. F.R.Civ.P. 15 (b).

 The court found that the bridge construction was of 1885 vintage and that it was so constructed that the downstream opening of the bridge was three inches lower than the upstream opening and that the defendant's roadbed and tracks above the bridge for a distance both east and west had been raised approximately eighteen inches subsequent to 1926. The significance of this finding is not entirely apparent, but in any event it is indecisive since the trial court's findings of negligence and proximate cause were based squarely upon the " * * * failure to keep and maintain its bridge, its ditches and its roadbed." The railroad also seems to suggest that the ravine from which the water overflowed was a natural water course and that the overflow waters became common enemy surface waters as to which the railroad incurred no liability. See Palmer v. Waddell, 22 Kan. 352; Sandstrum v. Missouri Pac. R. Co., D.C., 39 F.2d 165. It is sufficient that the trial court's finding to the effect that the obstruction to the railroad bridge caused the water " * * * to back up in its natural water course until it overflowed the natural banks thereof * * * " is supported by the evidence adduced by both parties in this case. If the obstruction proximately caused the overflow and consequent damage, the name given to the flood waters is immaterial. See Niccum v. Atchison, T. & S. F. Ry. Co., supra. The Kansas cases relied upon by the railroad which adhere to the common law rule that one must protect himself against surface waters as a common enemy have no application here.

 The issue of contributory negligence is fully met by the conclusion of the court that the railroad—not appellee—was obligated to maintain the leveed ditch parallel to the leased land. There was some evidence to the effect that when the leveed ditch was constructed in 1938 or 1939, the then abutting landowners signed a letter agreement with the railroad that it would maintain the ditch for a period of five years after which it would have no further responsibility. The letter agreement was not produced, and the trial court found that its terms had not been established with sufficient clarity to determine its provisions so as to fix the liability for the maintenance of the ditch at the critical times here. In that regard the trial court further found that the railroad, having constructed the ditch and levee downstream from its right-of-way in 1939 and having maintained or reconstructed a portion of it in 1948, had and still has a con-

tinuing duty to maintain it so as to carry all the water that might reasonably be expected to flow into it. This legal conclusion is based on facts which render it not clearly erroneous. We accept the trial court's view of the appellant's claim of contributory negligence. But, in any event, this judgment is sustained on the theory that the obstruction to the bridge diverted the water in a northwesterly direction south of the railroad bridge over the roadbed and onto the appellee's land without entering the leveed ditch. In other words, the flood waters causing the damage here on which recovery is predicated never reached the leveed ditch, and its condition is not a factor in the determination of the issue of negligence or contributory negligence.

The railroad does not seriously contest the amount of the award for damages, but the farmer has cross-appealed claiming that the undisputed evidence entitled him to the sum of $543,566.50 for damages to his growing crops and vegetables instead of the $135,325.00 awarded by the court. There was extensive and detailed proof of damages to the crops which, if accepted by the court, would have entitled appellant to the amount he now claims.

The trial court found that by reason of the floodings of the leased premises on the critical dates the cross-appellant's growing vegetables and produce were " * * * completely destroyed and rendered unmarketable on that portion of the leased premises over which the accumulated flood water was discharged * * *." (It seems to be conceded that not all of the leased premises were actually flooded). It then proceeded to itemize the amount of acreage of each vegetable crop actually destroyed on each of the flood dates and to estimate the value of the particular vegetable destroyed. The court's value estimates and awards were calculated on the basis of the reasonable market value of the matured crops actually destroyed and rendered unmarketable, less the expense of marketing, and it also estimated the value of the unmatured plants destroyed by the July 6, 1961, flood on the basis of the cost of preparation of the seed bed, the fertilizer applied, the cost of the plants and labor in planting and cultivating.

Cross-appellant does not complain of the estimated value of the crops actually destroyed and for which damages were awarded. The point of the cross-appeal is that the court erroneously failed to award damages for crops growing on the leased land not actually inundated or destroyed but rendered unmarketable by reason of the fact that they were in the same "flooded area". As to that, they say the undisputed proof was to the effect that the undestroyed crops were in fact rendered unmarketable and the court had no discretion but to award damages for the reasonable value thereof which they say was the difference between what was awarded and what was claimed.

It is true as cross-appellant suggests that the railroad did not introduce any expert proof concerning marketability of the crops not actually inundated and destroyed but rendered unmarketable. And, cross-appellant invokes the same rule invoked by the railroad on the question of liability and argues that since the expert proof was all one way, it cannot be disregarded. The rule is, of course, the same.

It is true that the evidence was all one way to the effect that no crops were marketed from the leased premises after the floodings. But, the proof on the issue of whether the unmarketability of the unflooded crops was directly attributable to the negligent flooding leaves much to be desired. While we do not have the benefit of the court's reasoning in that regard, our own appraisal of the proof leads us to believe that the trial court proceeded on the premise that the proof was insufficient to show that the unmarketability was directly attributable to the negligent flooding. In any event in the state of the record we are satisfied that the trial court reached a just conclusion, and we shall not disturb it.

The trial court denied the claim for punitive damages without comment. But, implicit in its finding " * * * in favor of the defendant and against the plaintiff * * * " is the view from appraisal of all the facts that the evidence was not sufficiently clear, strong and convincing to warrant the conclusion that the railroad's negligent acts were intentionally done without cause or excuse, i. e. see Newman v. Nelson, et al., 10 Cir., 350 F.2d 602, and cases cited. While there was to be sure evidence from which the trial court may have found the requisite persistent indifference in the face of repeated complaints, it would indeed be extraordinary for this court to award punitive damages as a matter of law.

The judgment is affirmed.