No. 33,967

HANS JENSEN et al., *Appellants*, v. BUFFALO DRAINAGE DISTRICT OF CLOUD COUNTY et al., *Appellees* and *Cross-appellants*.

(84 P. 2d 961)

Opinion filed December 10, 1938.

*N. J. Ward*, of Belleville, for the appellants.

*M. V. B. Van De Mark, Charles C. Van De Mark* and *Clarence Paulsen*, all of Concordia, for the appellees.

The opinion of the court was delivered by

THIELE, J.: This was an action to enjoin the erection and maintenance of dikes along the Republican river in Cloud county, and from a judgment denying relief as prayed for, the plaintiffs appeal.

The appellees have filed a cross-appeal from that portion of the judgment adjudging that the Buffalo Drainage District was not legally incorporated, and also from a ruling on a motion to retax the costs.

The appellants' specifications of error are that the trial court erred as a matter of law in concluding that plaintiffs were not entitled to injunctive relief and in not requiring removal and abatement of the dikes of which complaint is made. Under the circumstances we are concerned only with the findings of fact as made by the trial court and its conclusions of law based thereon.

For our purposes the twenty-eight findings of fact may be summarized and quoted as follows: The Republican river flows through Cloud county in township 5, range 4, west, cutting the southwest corner of section 4 and intersecting sections 9, 10, 11 and 14. The river forms the south and west boundary line of Sibley township, wherein the plaintiffs reside, and the north and east boundary line of Buffalo township, wherein the defendants reside. At the time the lands were surveyed by the United States government, the lands bordering the river were meandered along the banks, and the irregular portions of the sections were designated as lots and the acreage noted on the survey. The river has an average width of 450 feet, the banks are of sandy loam, and the fall of the river is from four to six feet per mile. At the points in controversy the river flows south into section 9, and when near the southern line turns generally east, and after proceeding well into section 10, it turns northeasterly until near the northeast corner, when it turns abruptly southeasterly into section 11 and then flows almost directly south for over a mile into section 14. In the northeast part of section 10 the south bank is high and the river is narrower. Generally the lands of plaintiffs and defendants are what is called "first bottom" lands, and when the river overflows a considerable portion of the land is covered by water. After the flood of 1903 the landowners on the south side of the river, by agreement, constructed a dike on the south bank of the river to protect their lands from overflow water. In 1912 another agreement was made and another dike was erected, because the first dike had been damaged and destroyed by floods. At different times work was done on the dike, and after the 1915 flood there was reconstruction and repair. The river overflowed in 1869, 1887, 1894, 1899, 1902, 1903, 1911, 1915, 1917, 1923, 1926, 1932 and 1935. In 1917,

1923 and 1926, at least, the river didn't overflow the south side. Some of the overflows were caused by an ice jam where the bridge of the Missouri Pacific Railway Company crosses the stream. The railroad runs almost due north and south and crosses the river just west of the east line of section 9.

"13. The first bottom land on both sides of the river is approximately on the same level. In time of flood the water first leaves the Republican river at some point north of plaintiffs' land in Republic county. Before this floodwater which has left the banks at a point farther up the river has reached the plaintiffs' land, the water comes out of the river at a low place on the east bank near where the section line between sections 4 and 9 intersects the bank. This floodwater mostly follows a low place across section 9 through a trestle bridge under the railroad, then on eastwardly through what was formerly called Lake George to find its way back into the river. The floodwater, which has come from a point farther up the stream, when it reaches this neighborhood follows partly the same course, but some portions of it and the other water which has broken out at the low place mentioned, and which does not go out under the trestle bridge, flows on south along the west side of the railroad and thus into the river.

"15. At two or three different times when the river was high, water has been observed standing or flowing on the north side of the river across the land of some of the plaintiffs, before it was out of the banks on the south side of the river far enough to reach the base of the dikes as they stood at such times.

"16. At different times when the river has been high the floodwater which comes out on the south side of the river has gone over the dikes, and during the flood of 1935 the dikes were greatly damaged, and have since been reconstructed. . . . [The present dikes are more substantial than the former ones and in general are not so high.]

"18. Before there were any dikes on the south side of the river floodwater came out of the river at a point near where the Missouri Pacific Railroad bridge is now located, and flowed in a southeasterly direction across section 15 to the bench between the first and second bottoms, then along this bench mostly in an easterly direction until it reëntered the river.

"19. Some sort of a dike has been maintained on the south side of the river from 1905 until the present time, and after injury from floods has either been repaired or newly constructed promptly thereafter in much the same location as the present dike.

"20. As now constructed, and starting with the northwest end, the dike for 3,200 feet averages 4 feet higher than the river bank. For the next 1,200 feet the dike is 1 foot higher than the bank. For the next 2,800 feet it runs four and five feet higher than the bank. For the next 800 feet it is 4 feet higher and less. For the last 800 feet the river bank at some points is higher than the dike, but for the most part the dike is 3 feet and less higher than the bank. The new dike generally is not so high as the old dike. The river banks on either side of the river paralleling the dike as it now stands are approximately the same level."

The 1935 flood was the highest within the memory of the witnesses. Before the present construction was undertaken there were conferences between some of the plaintiffs and some of the defendants.

"22. . . . Said defendants knew that plaintiffs were objecting to the construction of the dike, but the construction was proceeded with. The present suit was not brought by plaintiffs until May 12, 1937, at which time most of the construction work had been completed. The only remaining work to be done at that time was the dressing up of the banks and other similar work."

According to the government survey, lots 9 and 10 contain 46.10 acres. In October, 1935, a petition for organization of Buffalo drainage district was filed with the board of county commissioners. All proceedings were regular except as to description of boundaries. A sample description was:

"Approximately 33 acres, lots 9 and 10, section 9, township 5, range 4 west of the 6th P. M., belonging to Anna Williams estate."

Later and in September, 1937, the board adopted a resolution to clarify and supplement, its effect being that the intent was to include in the boundaries of the drainage district:

"Various sections and subdivisions of sections therein described which were in the first river bottom and which territory has well-defined boundaries; and that the territory intended by this board and its individual members to be incorporated as said drainage district was the territory so understood to be described in the said petition and notice.

"26. The effect of the maintenance of the dike in question has not yet been observed, as no flood has occurred since its construction, but the court concludes that it will prevent floodwater which leaves the bank of the river on the south side from passing across the defendants' land until such time as a flood gets sufficiently high to pass over or through the dike. The result, so far as the north and east side of the river is concerned, will be that the water flowing over the lands of the plaintiffs will be deepened, that the water will not leave plaintiffs' land as rapidly as it otherwise would if there were no dikes on the south and west bank, and more water will be forced through the bottleneck spoken of heretofore, causing more erosion of the bank at that point.

"28. Dec. 14, 1935, the plans of the district for dike construction were approved by the state engineer."

As a matter of law, the court concluded:

"2. The boundaries of the district attempted to be incorporated by the board of county commissioners are insufficiently identified and there is nothing in the proceedings which described them so that they can be accurately located; the incorporation of the district is invalid.

"3. Riparian landowners may maintain dikes along the banks of a stream to repel floodwaters for the protection of their own land so long as they do not

encroach upon the natural bed of the stream and do not maintain them for the purpose of injuring the property of others, and so long as they are maintained in such a manner as not to do substantial injury to the property of others on the opposite bank; this right to repel floodwaters is a reciprocal right.

"4. The defendants have not acquired a prescriptive right to maintain their dikes, since the flooding of plaintiff's land is not continuous, such flooding only occurring at intervals of years.

"5. While plaintiffs might perhaps have an action for damages if they sustain injury as a result of flood and the maintenance of defendants' dikes, since they did not bring this action until the dikes in question were practically complete, they are not in a position to ask injunctive relief.

"6. The injunction should be denied."

Motions to make additional findings and for a new trial were denied and judgment was rendered in accordance with the above conclusions.

Thereafter plaintiffs filed a motion to retax the costs. The court sustained the motion to the extent of disallowing witness fees claimed by one plaintiff and by five defendants.

It may be well to here take note of the fact that in the briefs there is some discussion of the evidence and citations of authorities on matters which are precluded by the trial court's findings of fact concerning which there is no specification of error, the specifications being only that the trial court erred as a matter of law. There is also some argument as to whether appellees have a prescriptive right to maintain the dikes. On that issue the trial court found for the appellants, so they may not complain, and the appellees, so far as the record shows, failed to complain in the trial court, and failed to assign such a ruling as error on their cross-appeal, so they may not complain. The matter is not properly before this court and will not be discussed.

We first notice the cross-appeal from the judgment that the Buffalo drainage district was never validly incorporated. As abstracted, there is no showing as to the particular statute under which the proceedings for incorporation were had, but we assume it was under the Laws of 1905, chapter 215, as amended, now appearing as G. S. 1935, 24-401 *et seq.,* which is applicable. Under that act, it is required the lands to be incorporated in the district must be defined in the petition for incorporation "by sections or subdivisions of sections" (G. S. 1935, 24-403). Upon proper notice, a hearing is held by the board of county commissioners, and upon proper finding it shall declare the territory described and the inhabitants within such

bounds to be a public corporation under the designation in the petition (G. S. 1935, 24-405). There are other statutory provisions which need not be specifically noticed. The petition for incorporation mentioned nineteen tracts, and over three-fourths of them had descriptions as indefinite as the one quoted above. While the statute makes no provision for a clarifying or supplementing order, finding or resolution, such as was made here, it is apparent the board became aware that the original petition failed to sufficiently describe the lands included in the drainage district ordered incorporated. And even that resolution left much to conjecture, for while the "first river bottom" might have well-defined boundaries, there was nothing in the original petition, nor is there anything in the resolution, to show what or where they were located. Nor is there anything to indicate that the original petitioners intended to so define the lands to be included in the drainage district. The purpose of the statute is to include lands subject to overflow, etc., and to make an order that does not definitely describe such lands can hardly be said to be comformable to the statute. In any event, the original petition and the order of incorporation based thereon were lacking in certainty of description, and under the reasoning of *State, ex rel., v. Drainage District,* 116 Kan. 291, 226 Pac. 478, the order of incorporation was a nullity, and the trial court was correct in its ruling.

The principal question for discussion is whether the defendants as individuals had a right to build and maintain dikes on one side of the river, the effect of which might be to flood the lands of plaintiffs on the other side of the river. After a somewhat extended presentation tending to show that the Republican river is a navigable stream and that ownership of lands bordering it extend only to the bank of the stream—a proposition we are not called upon to decide —appellants direct our attention to a rule that a riparian owner has no right to construct a levee along the normal bank of a river to protect lands against overflow (16 A. L. R. 629) and to *Hofeldt v. Elkhorn Valley Drainage District,* 115 Neb. 539, 213 N. W. 832, 53 A. L. R. 1174, and authorities cited therein, to the general effect that an adjacent owner may not build dikes to repel overflow water, and that a stream at flood stage should be permitted to run where it naturally would run, and argues therefrom that any levee or dike built any place within the limits of where floodwaters would ordinarily run is a nuisance and should be abated, or, put another way, that no levee or dike may be built inside the high-water banks.

In *Clements v. Phoenix Utility Co.*, 119 Kan. 190, 237 Pac. 1062, the court considered the right of the defendant to erect a railroad grade which acted as a dike along the Neosho river. It was there held:

"1. Water which overflows the banks of a river at the time of an ordinary freshet or overflow and then flows over the lowlands or valley with the general course of the current of the stream, returning to the stream or its outlet farther down its course, is deemed a part of the water of the stream—following *Riddle v. Railway Co.*, 88 Kan. 248, 128 Pac. 195.

"2. The owner of property on the bank of a watercourse has the right to build levees or other barriers to confine the water to the channel of the stream, but he cannot build and maintain a structure which will change the channel or project the water against or upon the property of another, either on the same side of the stream with him or the opposite side, in such a way as will result in substantial injury to such property, without liability therefor—following *Parker v. City of Atchison*, 58 Kan. 29, 48 Pac. 631.

"3. The owner of property on the bank of a watercourse, in making improvements thereon, need not make provision for unusual or extraordinary floods which an intelligent person, knowing the history of the stream, could not reasonably have foreseen.

"4. An ordinary flood, in the sense here used, is one the repetition of which, though at irregular intervals, might by the exercise of ordinary diligence in investigating the character and habits of the stream, have been anticipated. An extraordinary flood is one of those unexpected visitations whose comings are not foreshadowed by the usual course of nature and whose magnitude and destructiveness could not have been anticipated or provided against by the exercise of ordinary foresight." (Syl. ¶¶ 1, 2, 3, 4.)

In the opinion the court commented on *Cubbins v. Mississippi River Comm'n*, 241 U. S. 351, 60 L. Ed. 1041, where it was contended no structures such as dikes or levees could be built between the high-water banks, saying of the United States supreme court:

"It refused to take the view argued by the complainant, 'that the valley through which the river travels, in all its length and vast expanse, with its great population, its farms, its villages, its towns, its cities, its schools, its colleges, its universities, its manufactories, its network of railroads—some of them transcontinental—are virtually to be considered from a legal point of view as constituting merely the high-water bed of the river' (p. 368), and concluded, from all the circumstances, that even annual overflows of the Mississippi river might be regarded as accidental and extraordinary within the meaning of the rule of law above stated." (p. 193.)

The effect of our decision was to give approval to that view. And that such view should be taken is apparent from our statutes bearing on the question. For our purposes here G. S. 1935, 24-105, reads:

"A landowner . . . shall not construct or maintain a . . . levee for the pur-

pose of obstructing . . . the flow of surface water to the damage of the adjacent owner . . . ; but nothing herein shall be construed as preventing an owner of land from constructing a dike or levee along the bank of a natural watercourse to repel floodwaters from such natural watercourse . . . *Provided further,* That where such surface water is the overflow of a watercourse on the premises of an adjacent upper landowner and such upper landowner has not constructed or maintained a levee along the bank of such watercourse to prevent overflow, any landowner may make application to the chief engineer of the division of water resources stating . . . and requesting permission to build a levee on his own land to repel such floodwater. The chief engineer (after hearing and finding) may then grant permission for its construction . . ."

Appellants seek to avoid the force and effect of the above statute, originally enacted as the Laws of 1911, chapter 175, for the reason that it was before this court in *Thompson v. McDougal,* 103 Kan. 373, 175 Pac. 147, and it was there said:

"The rights and limitations of rights of landowners in dealing with floodwaters were not changed, nor attempted to be changed, by chapter 175 of the Laws of 1911 (Gen. Stat. 1915, §§ 4050-4052), unless, indeed, they have been somewhat enlarged by section 2 of the act: (Quoting statute).

"To regard floodwaters escaping from a river as surface water led to little or no confusion before the enactment of 1911, but it may sometimes do so now." (p. 376.)

However, since its enactment in 1911 the statute has been amended so as to read as summarized above, and by its terms to enlarge the powers of riparian owners to protect themselves.

It must be remembered that we are not here considering an action for damages. We are concerned only with whether the erection of the dike, during its course of construction, could be enjoined, or after its erection could be abated as a nuisance. The trial court found the work was substantially completed before the action was filed; and it further found that the plans of the district for its construction had been approved by the state engineer. We note appellants' contention that this approval was under G. S. 1935, 24-1071, which is part of an act declared unconstitutional in *Verdigris Conservancy District v. Objectors,* 131 Kan. 214, 289 Pac. 966. There is no showing in the record as abstracted that compels such a conclusion, and it is not consistent with the finding of the trial court. Even though the district was not validly organized, that did not make the construction unlawful, for the individual owners could have procured a like result under the statute above quoted.

We are of opinion the injunction was properly refused. The defendants, using the drainage district as a means, projected a plan

for construction of the dike, procured approval from the officer vested with power to give it, and financed and performed the construction, all with knowledge of the plaintiffs. If there was anything irregular or illegal connected therewith, it was not promptly urged, and for that matter at the trial was not shown, with the exception of invalid organization of the drainage district.

Insofar as the claim of nuisance is concerned, it may be answered by this: The construction of the dike was made under a statute authorizing it. If a lawful structure will result in an unlawful use, it has not yet occurred, nor has it been at all conclusively shown it ever will occur.

There remains the question of whether the trial court erred in ruling that individual parties litigant were not entitled to fees as witnesses. The record as abstracted shows no more than that the claimed fees were disallowed. There is no showing of any kind that the ruling was erroneous and in the absence of such a showing we cannot disturb the ruling.

The judgment of the trial court is affirmed.