# MORRISON v. STATE BANK OF WHEATLAND ET AL.

(No. 2219; June 16, 1942; 126 Pac. (2d) 793)

For the appellant, there was a brief and oral argument by *W. B. Jones* of Wheatland and *James A. Greenwood* of Cheyenne.

For the respondents, there was a brief and oral arguments by *Bard Ferrall, A. D. Walton* and *M. A. Kline,* all of Cheyenne.

Before Riner, Chief Justice; Blume, Justice; and Metz, District Judge.

METZ, District Judge.

This action was brought in the District Court of Platte County by Margaret Morrison and H. W. Loomis, as plaintiffs, against the above named defendants, The State Bank of Wheatland, Josephine M. Brice, Paul H. Toy, A. L. Kendig and Oscar O. Natwick, as members of the Board of Directors of said Bank, to compel them to declare and pay a dividend of *"not less than $600.00 per share"* upon the outstanding shares of the capital stock of said bank.

The attorneys for plaintiffs had made a demand upon the bank and its directors on September 20, 1939, for the payment of a dividend of not less than $500.00 per share. The defendant Brice replied to that letter on October 18, 1939. In her reply, she stated that the directors were anxious to pay the dividends and were bending every effort to that end, but that no dividend could be paid until all losses were eliminated. This reply was not satisfactory to plaintiffs and their attorneys, and, therefore, this action was brought by them on December 15, 1939.

At the meeting of the Board of Directors on January 8, 1940, the subject of the payment of dividends was brought before the board at a regular meeting of the Board for the first time since these defendants became directors, and upon motion of the plaintiff, H. W. Loomis, a dividend of 10% was declared. Later, on August 20, 1940, another dividend of 15% was declared, and on January 13, 1941, a further dividend of 25% was declared.

The plaintiff Loomis, who during all these times was a director of the bank, was satisfied with these payments of dividends, and thereafter he filed in the office of the Clerk of the District Court a paper in which he stated in effect that he was satisfied with the dividend payments that had been made and which were being made, and asked that the case be dismissed. Thereupon, the court made an order dismissing the case as to him. This left Margaret Morrison, who was the owner of only 12½ shares out of a total of 400 shares of the bank's stock issued and outstanding, as the sole plaintiff in this action.

The plaintiff, as a basis for a recovery in this action, charged bad faith on the part of the defendants in the management of the bank's business and in the purchase and acquisition by them of the stock of other stockholders. These charges were denied by the defendants. The plaintiffs annexed to their pleadings certain interrogatories and demanded that the defendants answer said interrogatories categorically and under oath.

The trial lasted several days. At the close of plaintiff's evidence, the defendants jointly and severally moved the court for judgment. Their motion was sustained by the court and judgment was entered as prayed for, and it is from this judgment that the plaintiff has taken her appeal to this Court.

While the motion for judgment was made at the close of plaintiff's evidence, yet, as shown by the record, before that time plaintiff had called her former co-plaintiff, H. W. Loomis, and Hugh McDonald, as directors of the bank, and also the defendants Brice, Kendig and Natwick for cross-examination under the statute. In addition, the testimony of three of defendants' witnesses, A. E. Wilde, O. E. Bertagnolli and L. A. Christensen had been taken out of order. As a result of this procedure, much of defendants' proof as well as

their sworn answers to the interrogatories propounded to them were before the court at the time the motion for judgment was made.

The plaintiff's petition alleged in substance that the defendant Bank, while in financial condition to do so, should and could have paid, during the years from 1936 to 1940, substantial cash dividends, did not do so because of an ulterior and dishonest motive of the defendant directors, Brice, Kendig and Toy, to gain control of the defendant Bank and acquire ownership of all its assets for a grossly inadequate consideration, by buying up all the outstanding shares of capital stock; that this scheme was conceived by defendant Brice at the time she became an officer and director of the defendant Bank, in which the defendants Toy and Kendig actively joined and participated, and the defendant Natwick, being in fact only a dummy director, unwittingly contributed to this scheme of the other three defendants in yielding to the solicitation of defendant Brice to become a director of the defendant Bank; that during all of the years from 1913 to 1933, inclusive, it had been the settled policy of the defendant Bank, acting through its Board of Directors, to pay dividends to its stockholders; that after 1935, the personnel of the Board of Directors of the defendant Bank changed, with a majority of the new members being under the control and influence of defendant, Josephine M. Brice, and the policy of not paying dividends prevailed, otherwise the scheme to purchase stock and gain ownership of the assets of the Bank would fail; that the refusal to declare and pay dividends was a violation of the rights of the stockholders, constituted unlawful, arbitrary action, abuse of authority, and violated the trust reposed in these defendants as officers and directors of the defendant Bank; that immediately following the passing of D. W. Brice, the defendant Josephine M. Brice became a director of the defendant Bank, first

representing the share of stock owned by the estate of D. W. Brice, during the fall of 1935, and continuing as a Director of the Bank thereafter, and she immediately began the pursuit of this scheme to control the Bank and the Board of Directors, and make it possible for the defendants to buy up for a grossly inadequate price, the outstanding shares of capital stock, while concealing the actual value of the shares of capital stock and the amount, character and value of the assets of the defendant Bank, and for her to take advantage of her position as Director and Officer of the defendant Bank to gain other personal advantages and profits in obtaining Bank property unlawfully and for grossly inadequate consideration or no consideration; that in pursuit of this policy, she directed the transfer of five shares of capital stock without consideration, from her son-in-law, Paul H. Toy, to O. O. Natwick, who was soon thereafter, at the annual meeting of the stockholders, January, 1936, elected as a member of the Board of Directors. That her next move was to proceed with the purchases of outstanding shares of capital stock of the Bank for a dictated, fixed and controlled price; that to aid in the consummation of this scheme, no dividends were to be paid, a general impression should be created among stockholders that the Bank's financial condition was such that the payment of any dividends would be impossible; that this procedure should be followed until the owners of all the outstanding capital stock had been induced to sell their shares to defendants Brice and Kendig; that competition in buying by any other parties would be eliminated by depressing the actual value of the stock, concealing actual value, character and amount of assets of the Bank; that defendant Brice would control the selection of members of the Board of Directors, and by controlling the individuals on the Board, she would control the action of the Board; that she made possible the selec-

tion of defendant Natwick, as a Board member, by a gift of stock, so he could qualify, and he was elected at the 1936 annual stockholders' meeting; that in 1937, she caused her son-in-law, Paul H. Toy, to whom capital stock had been given, also to be elected to the Board of Directors; that she entered into an agreement or understanding with the defendant A. L. Kendig, early in 1937, whereby defendant Brice was to obtain and turn over to defendant Kendig, a substantial block of the capital stock, which she was to deliver to him at $200.00 a share and that he was, after the stock purchases were made, to become a director and executive vice-president of the defendant Bank, but his connection with the scheme was to be concealed during the stock-buying campaign.

The defendants' answer in substance denied that it was ever the settled policy of the Board of Directors of defendant Bank to pay dividends, and alleged that on the contrary, it had been the general policy of said Board, from the very beginning, to build up a large surplus fund or working capital, so as "to enable the defendant Bank to become a strong financial institution and to have sufficient funds on hand at all times to aid in the development of the Town of Wheatland and the surrounding country;" and they further alleged that none of the individual defendants had had anything to do with the establishment of such policy; alleged that since they became directors they have followed such established policy because in their honest judgment it was for the best interests of all parties concerned so to do; alleged that each and every of them at all times had exercised his or her best judgment in acting upon matters that came before the Board for its decision, and that defendant Brice had never at any time influenced or attempted to influence any of them as to how they should vote on any such matters; alleged that they took up the question of

dividends at the first regular meeting of the Board after demand was made upon them by plaintiff for the payment of a dividend, and upon motion of the plaintiff Loomis, the members of the Board voted unanimously to declare and pay a dividend of 10%, and that such dividend in the fair and honest opinion of every member of the Board was the largest amount that should be paid in the way of dividends at that time.

In addition to the above allegations, each individual defendant specifically denied each and every charge of misconduct made against her or him in the petition, and alleged that at all times they had acted in good faith and for what they considered the best interests of the bank, its depositors and stockholders.

The main question involved in this litigation is: "Did the directors of this bank fail or refuse to declare dividends upon the stock of the bank for the sole purpose of depreciating the value of the bank stock and compelling a sale of the same by different individuals to some of the directors, and has the plaintiff proven the allegations of her petition?" This is the first time the question of requiring the payment of dividends by a bank has been before this court for its consideration.

Hundreds of cases may be cited showing that the law is well settled as to the rights of stockholders and the duties and responsibilities of directors in the average private corporation, but cases involving the demand for the payment of dividends by a bank are, in comparison, few.

The general rule in regard to the payments of dividends by a corporation is thus stated in 18 C. J. S., p. 1106:

"The mere fact that a corporation has a large amount of surplus or net profits does not entitle the stockholders to the payment of dividends. When a corporation

has net or surplus profits, unless some restraint is imposed by statute, charter, by-laws, contract, or otherwise, whether a dividend shall be declared, and, if declared, its amount, rest in the sound discretion of the directors. Generally speaking, the courts have no right to declare dividends, and in the exercise of their discretion directors will not be controlled or interfered with by the courts, unless they act fraudulently, oppressively, or unreasonably."

The rule is also well stated in Cook on Corporations, (7th ed.) p. 1587:

"The discretion of the directors will not be interfered with by the courts unless there has been *bad faith, wilful neglect, or abuse of discretion.*"

As indicated before, this case is predicated upon an alleged conspiracy, fraud, and bad faith on the part of the directors, and particularly on the part of Josephine Brice. The record in this case is quite voluminous, involving some thousand pages. The history of this bank is interesting, and perhaps portrays the trial and tribulations of the average bank doing business in a small town, depending upon the farmers and stockmen for its business, they in turn depending upon an uncertain water supply, sudden and depressing fluctuating livestock values for their income, and contending with several years of drouth and a national depression.

This bank was organized under a state charter on December 12, 1903, the capital consisting of two hundred shares of stock, $100.00 par each. David W. Brice, husband of defendant Josephine Brice, was one of the original organizers of the bank, subscribing for fifty shares of stock. He was a director, and president, and managed the bank, with the assistance of a board of directors consisting of stockmen and farmers living in the Wheatland community.

The bank was very successful for thirty years; in a short time declared a 100% stock dividend, and during

the years accumulated large reserves, and paid large dividends until 1934.

The men who organized and owned this bank, like scores of others in a dozen or more banks organized throughout the cow-country of Wyoming, were pionees and builders, and determined to maintain a strong financial institution, and undoubtedly were proud of their bank and their community. These men knew little of the internal workings of a bank, but they did know the farming and livestock business, and they were good judges of values in normal times.

By March, 1933, the bank had a $40,000.00 capital, a $60,000.00 surplus, and had set aside a $284,000.00 special working fund, all of this having been plowed back into the capital structure by the directors, of whom the plaintiff's father was a moving party, and from whom the plaintiff inherited her stock.

Then the drouth, lack of water, crop failures, depleted farm and livestock values, hit the Wheatland country, and within a few months the bank's loans became more and more frozen, and, the directors of the bank desiring to become a member of the Federal Reserve system and to secure Federal Depository insurance, it was examined by both Federal and State Bank Examiners. The examiners gave this bank a thorough examination and compelled the directors of the bank to charge off $190,000.00 of bad loans and assets, and to set up a special reserve of $100,000.00 to cover additional doubtful and slow paper then held by the bank. The bank examiners further informed the directors that this $100,000.00 special reserve fund was not to be used or in any manner reduced without special permission from the State Bank Examiner's office.

Up to the time of the death of D. W. Brice, on August 18, 1935, the record shows that he was the dominant

figure in the bank's business, and that he ran the bank. It also appears that he must have carried a great deal of the details of the loans in his head. We can reasonably assume from this record that he was not only an old-timer, but that he knew everyone in the Wheatland community and knew their business and their holdings, and as a consequence, he did not maintain in the bank and keep the necessary books to properly list the personal property covered by the chattel loans, and as shown from the evidence of the State Examiners, no inspection of livestock was made by the bank, no abstract of the chattels was made, and it was nearly impossible for anyone to state what the bank's stock was worth without a long and tedious personal examination of each and every loan. Even men of long experience in the banking world, such as Wilde, Christensen, and Bertagnolli, all of the State Examiner's Department, could not put a value on the stock, particularly because of the poor book-keeping practiced in the bank.

The record further discloses that directors Brice, Johnson, Loomis, et al., during the 1920s, appreciating and realizing the advantages and necessity of maintaining a strong bank with plenty of funds to loan, and showing their desire of building up the capital to the half-million dollar mark, passed resolutions to this effect. As years passed, the personnel of the board of directors was changed through death, and Brice, growing old, brought his son-in-law, Toy, into the bank to learn the business. In August, 1935, Brice died, and thus we first hear of Josephine Brice, his widow. Josephine Brice knew little about business and less about the bank, but she wanted to keep the bank alive and carry on where her husband left off. She was appointed executrix of her husband's estate, and she soon started attending directors' meetings. She asked her son-in-law Toy to transfer five shares of his stock in the bank to Natwick, an attorney at law, so that he, Natwick,

might be on the board of directors to assist and properly advise her on the law and her duties.

Meanwhile, the rate of mortality was heavy among the stockholders, and by 1936, and 1937, a great number of shares of stock in the bank was owned by estates. Mrs. Brice began to look for some experienced banker to come into the bank and to take over its management and to become financially interested in the institution. So concerned was she about having a proper manager in the bank that she consulted, at numerous times, with Mr. Wilde, the State Bank Examiner, and attempted to prevail upon him to buy stock in the bank and to come in and manage its affairs.

Mrs. Brice inherited 85 shares of stock from her husband, and during 1936 and 1937, she purchased some 212 shares of stock held by the bank, different estates and individuals. All of this stock purchased was held by parties or estates that were of no financial benefit to the bank and did not assist in its operation or management. The old-time directors had passed away, and Mrs. Brice, knowing nothing of the bank's affairs, and Toy having been in the bank only a short time before D. W. Brice's death, and Christensen having left in the spring of 1935, must have realized the desirability of securing trained and responsible management for the bank. She purchased from different individuals through 1936 and 1937 small blocks of stock, paying $200.00 per share for the same, with the exception of a few shares for which she paid $210.00 per share. She continued to try to interest Mr. Wilde, the State Bank Examiner, in the bank and to get him to come in and manage the same, and offered him the stock for $200.00 a share. Wilde agreed to investigate the matter more thoroughly and to consider the matter, and did so, and in the spring of 1937, Mr. Wilde notified Mrs. Brice that he would not come into the bank or purchase any

stock therein, giving as his reasons that the credit files were not sufficiently complete for anyone to determine the proper classification of the assets of the bank; that the water conditions were bad in the Wheatland community; that the crop conditions were not good; that the bank was in litigation and had prospects of more litigation, and that he was not desirous of buying bank stock under those conditions.

Upon Mr. Wilde's refusal to become interested in the bank, Mrs. Brice requested him to recommend to her someone who would fit into this picture and who could buy stock and would come in and manage the bank, and pursuant to this request, Mr. Wilde recommended Mr. Kendig, who was then with the R. A. C. C., and on Mrs. Brice's request, Mr. Wilde telephoned Mr. Kendig, requesting him to come into his, Wilde's, office to meet with Mrs. Brice and Mr. Toy, which meeting was consummated. As a result of this meeting, numerous other meetings were had, some in the Examiner's office, between Josephine Brice and Kendig. Finally, it was agreed between them that Kendig would come into the bank and purchase some stock at $200.00 a share, and that Kendig would take over the management of the bank. Thus we see how these four directors and defendants became associated together and interested in the bank.

During the years 1934 to 1939, the directors charged off, at different times, notes and loans of their own accord which they considered bad or doubtful. No dividends were paid by the bank between 1936 and 1940, and by 1940 the capital structure of the bank had been built back up to about $275,000.00, but at no time had the bank shown as large a financial statement as that shown at the time the Bank Examiners directed the chargeoff of $190,000.00 in 1933.

The record discloses the policy of the bank to have

been at all times to keep large reserves on hand, and this policy had been maintained for a great many years prior to the time that any of these directors were either stockholders or directors in the bank.

In the case of Trimble v. American Sugar Ref. Co., 61 N. J. Eq. 340, 48 Atl. 912, in the opinion of Judge Pitney, afterwards a member of the U. S. Supreme Court, it appears that the plaintiff owned a small minority interest and complained about the directors handling of the company business. In deciding the case, the Court said in part:

"Admitting that the holder of so small a part of the stock is entitled to be heard in this court for the correction of any real grievance he may suffer by the misconduct of the majority, yet I think it is the duty of the court to require that he show a clear case by distinct affirmative allegations. * * * The bill does not state at what time complainant acquired the 100 shares of stock which he holds. * * * For aught that appears, he may have acquired it a very short time before the filing of the bill, from a holder who had acquiesced in everything that the company had done up to that time, and in the policy the carrying out of which the complainant seeks to enjoin. That such acquiescence would bar the original holders of the shares now held by the complainant if he knew of it is perfectly well settled. It is necessary on this point only to refer to the case of Rabe v. Dunlap, 51 N. J. Eq. 40, 25 Atl. 959. And it seems to me that where a person holding so small a fraction of the capital stock as the complainant represents here asks to interfere with a particular phase of the management of the corporation, which is presumably satisfactory to all the other stockholders, he ought to show affirmatively that neither he nor his predecessor in title had acquiesced in the policy of which he now complains, for I think he would be bound by the acquiescence of his predecessor in title."

The record discloses that these defendants became directors in the bank at about the following times: Josephine Brice, August, 1935; Natwick, January,

1936; Paul Toy, February, 1937; A. L. Kendig, August, 1938.

It is of interest to note that D. W. Brice's death occurred about a year and a half after this $190,000.00 charge-off was made by the Examiner; and we take it as a matter of course that these officers and directors had learned about this required action by the Examiners. No wonder these new directors were cautious about dividends and desired to build up the reserves, and especially so considering the drouth and water shortage the community was suffering. It is not necessary for us to comment on the losses of livestock and crops during these two or three years, as indicated by this record. The drouth was general and was not confined to the Wheatland community. The western states were all having their troubles. We wonder what would have happened in 1933, when this $190,000.00 was charged off, if the policy of the bank had not been to maintain a large reserve. It probably would have been closed, and another bank failure added to the list. Complaint is made also that it was a policy of the directors to unnecessarily and unreasonably charge down the value of the banking house and its fixtures owned by the corporation. This, in our mind, is good business and good banking, and is encouraged by the State Bank Examiners. The average bank building is not suitable for other purposes, and as proof of the fact we need only to look about the state at the old bank buildings once occupied by now defunct banks, standing vacant in some of the towns, bleak evidence of their lesser value. There is no question but what this bank, in 1939, at the time the demand was made by the plaintiff, that the directors declare a dividend, had good-sized reserves, and also that if the directors felt that in their opinion a dividend should have been declared, it could have been paid without any criticism. But that is not the point involved in this litigation. We are not con-

cerned about how large the reserves are, only as indicating the feasibility of a dividend. The payment of dividends is entirely a matter for the board of directors, if they are acting in good faith. The courts do not step in, dictate to directing boards how to run their business, or substitute the court's judgment for the judgment of the governing body of the corporation. Only in extreme cases, and then only where the evidence is clear, satisfactory and convincing that the directors are acting either in a fraudulent manner, or with ulterior motives, will the court interfere.

"There is no rule of law which prevents one or more persons from purchasing a majority of the shares of a corporation for the purpose of acquiring control thereof." 18 C. J. S. 1174.

And the above rule of law applies even when the purchase of its stock is made by an officer or director of the corporation. See 84 A. L. R. 816, and authorities cited. In regard to this, the author of the annotations says:

"The general rule is that an officer or director of a corporation does not sustain a fiduciary relation to an individual stockholder with respect to his stock, and consequently the mere failure on the part of such officer or director, in purchasing the shares from the stockholder to disclose any inside information, will not militate against him so long as he does not actively mislead the seller or perpetrate a fraud; in other words, ordinarily, a corporate officer or director has a right to purchase the stock of a shareholder therein, the same as any other person has a right to purchase such stock, and there is nothing in the mere fact that the purchaser is an officer or director of the corporation whose shares he purchases from which fraud or unfair dealing may be inferred."

There are a few cases holding to the contrary, but the above rule is sustained by the overwhelming weight of authority.

In the case of Blanchard v. Prudential Insurance Co., 80 N. J. Eq. 209, 83 Atl. 220, suit was brought by the plaintiff and others against the Prudential Insurance Company to compel a distribution to them by way of dividends of an equitable portion of the surplus from the accumulated profits of the company which then amounted to $2,500,000.00. In their bill they alleged that this money was available for such purpose, and that the directors of the company "arbitrarily and illegally in a way fraudulent in law and subversive of the rights of the stockholders not assenting thereto" withheld the payment of dividends out of said surplus. The trial court directed the payment of a dividend. Its judgment was reversed by the Court of Errors and Appeals. The court held that the payment of the dividend as ordered by the trial court would amount to a dividend of 125%, and in this connection it is said:

"The defendant company claims that it is necessary to retain this fund in order that the solvency of the company may be amply secured. This at once gives rise to a question which appertains to the wisdom of business management and foresight, and does not call for the interference of the court. The complainants are practically seeking to have the business management of a life insurance company put into the hands of the court. Upon what basic legal principle the court is asked to substitute its judicial sense for the business sense and discretion which must rest with the directors of the company has not been made clear."

"The rule of law is well stated by Vice Chancellor Van Fleet in Park v. Grant Locomotive Works, 40 N. J. Eq. 114, 3 Atl. 162, affirmed on opinion, by this court, in 45 N. J. Eq. 244, 19 Atl. 621, as follows: 'In cases where the power of the directors of a corporation is without limitation, and free from restraint, they are at liberty to exercise a very liberal discretion as to what disposition shall be made of the gains of the business of the corporation. Their power over them is absolute so long as they act in the exercise of their honest judgment. They may reserve of them whatever their judgment approves as necessary or judicious for

repairs or improvements, and to meet contingencies, both present and prospective. And their determination in respect to these matters, if made in good faith and for honest ends, though the result may show that it was injudicious, is final, and not subject to judicial revision.' The same subject received consideration in Laurel Springs Land Co. v. Fougeray, 50 N. J. Eq. 756, 26 Atl. 886, by this court, by Mr. Justice Garrison, where he clearly states the legal rule to be 'that the authority of the directors is absolute so long as they act in the exercise of an honest judgment.' "

In 55 A. L. R. 57, we find the following comment made by the author of the annotation on the general question of the right or duty of a bank to pay dividends:

"The rule that directors have a discretion as to declaring dividends or to retaining their surplus profits for a reserve, with which discretion the courts will not ordinarily interfere, in the absence of bad faith, has been regarded as *especially* applicable to banking institutions. And, where the charter of a bank gives the management of its affairs to a board of directors, and expressly makes it the judge of that portion of the profits which it is advisable from time to time to divide among the stockholders, a very strong case should be made to justify a court in interfering with the management, and substituting its own judgment for that of the board as to the quantum of the profits which it is proper to divide."

As stated above, there are very few cases in the reports, where an attempt has been made to compel the payment of dividends by banks.

In the case of Reynolds v. Bank of Mount Vernon, 6 App. Div. 62, 39 N. Y. S. 623, action was brought by Reynolds as a stockholder of the defendant bank to obtain several forms of equitable relief. The bank and Rogers, its president, were named as defendants in said action. The only question raised by the petition in that case which is of importance in the present case, was the right of the plaintiff to a mandatory injunction

requiring the defendants to declare and pay a dividend or dividends out of surplus funds of the bank. At the close of plaintiff's case, his complaint was dismissed by the trial court, and upon appeal the judgment of the trial court was affirmed. We quote at length from the opinion of the court:

"The second subject of complaint was that, though the bank had continuously earned money, only one dividend had been paid from the organization of the bank to the commencement of the action, the profits being allowed to accumulate as a surplus. After the commencement of the action, the bank commenced declaring dividends at the rate of 8 per cent. per annum, which has been continued up to now. Still, if the plaintiff had any cause of complaint in this respect at the time he brought the action, the subsequent conduct of the bank would not defeat his right to maintain the action. The broad claim is made on behalf of the plaintiff that the accumulation of profits for the purpose of creating a surplus is a violation of the articles of association, and illegal, because it is practically increasing the capital stock. That it does, in one sense, increase the capital of the bank, is unquestionable; but we have never known of such action being challenged. The propriety of accumulating some surplus is too palpable to require extended discussion. When the capital stock of a bank is impaired, the deficiency must be made good by an assessment on the stockholders; and, in case the deficiency is not made good within 60 days, proceedings may be instituted against it, as in the case of insolvent corporations. Hence, if such a corporation should divide all its profits and accumulate no surplus, any business loss would subject it to the hazard of a receivership and business loss of its corporate life. This danger is so apparent that of late years it has been common, on the forming of banks or trust companies, to pay in 50 or 100 per cent. in addition to the nominal capital stock; so that the corporations may begin business with a surplus. Some banks have accumulated so much of their profits that the surplus is from 10 to 30 times the amount of the capital stock. These banks stand the highest in the commercial world. Nor is this conduct illegal.

"In the case before us there is nothing to show that the action of the directors in accumulating the surplus proceeded from any other motive than the good of the bank. Whether it was wise to accumulate all the earnings, instead of distributing part to the stockholders in dividends, was a question which rested in the discretion of the directors, and as to which we are called upon to express no opinion. The plaintiff, for some time, seems to have sanctioned that course. However, even if the course was continued against his opposition, there is nothing in the case before us which would give the court the right to interfere with the action of the directors."

As stated by the court in the above case, banks which have accumulated a surplus of from 10 to 30 times the amount of their capital stock stand the highest in the commercial world. In other words, the larger the surplus in proportion to its capital stock, the higher the business standing and rating of the bank.

A later case where the same question was raised in reference to the power of a court to compel the directors of a bank to pay a dividend is the case of Mulcahy v. Hibernia Savings and Loan Society, 144 Cal. 219, 77 Pac. 910. In that case, the plaintiff, in his own behalf and on behalf of others similarly situated, brought an action to compel the distribution of a portion of the reserve fund of the defendant bank among the shareholders. Plaintiff alleged that said reserve fund amounted to $2,500,000.00, and he asked to have all but $750,000.00 of said fund distributed as dividends. Defendant demurred to the complaint on various grounds, many of which were sustained, and upon plaintiff's refusal to plead further, his action was dismissed. The Supreme Court held that the petition did not state facts sufficient to constitute a cause of action. After discussing the statutes of the state and the

by-laws and the articles of incorporation of the defendant banking institution, the court then said:

"The question as to what sum in excess of $100,000 shall be reserved is left by the statute entirely to the discretion of the board of directors. This being true, the familiar rule of law applies, that where the powers of a board of directors of a corporation are unlimited and unrestrained with reference to the disposition that shall be made of the surplus funds of the corporation, they are at liberty to exercise a very large discretion in that respect; that, so long as they act in the exercise of an honest judgment, their power over such funds is absolute. They have a right to act with regard to them as their best judgment determines is necessary or judicious, and, where they have done this, their action is not subject to control by the court. Particularly is this true relative to banking corporations, where it is generally committed to the directors to exercise their best judgment upon a knowledge of the affairs of the bank, the requirements of its business, and the extent of its liability to its depositors and other creditors; where it must devolve upon them to take such precautions and to adopt such measures concerning a reserve fund and its amount as will amply enable them to provide for present and future contingencies, and fully conserve and protect the rights of their depositors by prudently providing for prompt payment of possible losses. In the nature of things, it would be practically impossible to determine in advance, with any precision or accuracy, just what amount would be safe to retain for such purpose, and hence a discretion on the subject must necessarily be left to the proper officers of the corporation. And where this discretion is unrestrained by either the charter or by-laws of the corporation or the statutes of the state, and is exercised in good faith, the courts will not interfere in the matter, or attempt to control the action of the corporation."

In the case of Sarles v. Scandinavian American Bank, 33 N. D. 40, 156 N. W. 556, the Court in its decision called attention to the fact that as in the present case, the plaintiff alone was dissatisfied with the management of the bank's affairs; that the State Bank Exam-

iner was making no complaint about the management of the bank and was not a party to the action; and to the further fact that if no dividends were paid and the profits were transferred to the surplus account, the institution was strengthened. In its opinion, the court in reference to the discretion vested in the directors of a bank in regard to the payment of dividends, said:

"It is too clear for argument that courts will not interfere with the private management of corporations, unless some violation of law is charged. When the stockholders organized those corporations they delegated to those directors the management of the funds within the limits prescribed by law. Among those powers conferred upon the directors was the distribution of the undivided profits. Such directors can distribute the funds as dividend, place it in the permanent surplus, or expend it for betterments. So long as they do not act fraudulently in so doing, there is no reason to disturb their action. It is practically conceded that the directors in the case at bar are acting for what they consider the best interests of the bank, and it must be conceded that their action does not in any way impair the financial standing of said institution."

It is quite apparent from reading this record that these new directors, and particularly Mrs. Brice, did not know the value of the stock in this bank. The physical condition as testified to by Wilde, Christensen, Bertagnolli, and herself, shows that even an expert would have had considerable difficulty in arriving at the actual value of the stock in this bank. All of their acts, under the conditions as they existed at that time, between 1935 and 1939, taking into consideration the unsettled conditions, drouth, lack of water, depreciated livestock values, can be more reasonably construed as being in good faith and being cautious, rather than indicating fraud.

The plaintiff contends that this case comes under the "special circumstance rule," which applies to cases

where the court can say that false representations were actually made, or there were special circumstances of such a nature that the court regarded the purchasers' conduct or failure to make full disclosure as fraudulent in law, or where a director as purchaser, knowingly makes only a partial disclosure to a stockholder seeking information amounting under the circumstances, to a fraudulent concealment.

See "Stock purchase by officer or director," 84 A. L. R. 623, subdivision III, with authorities cited therein.

The plaintiff, in her own testimony, could say no more about the subject of the offer to buy stock from her than that Mrs. Brice had written her, stating that as the plaintiff's bank stock holdings were small, "she thought I would no longer be interested and would like to sell it to her." And as to Kendig's statement, she testified that he, Kendig, said "he had heard the stock was for sale and he would like to buy it," and "I told him the stock was not for sale." And another time, "he asked to buy my stock; he said he would pay $200.00 for it, and I told him I thought it was worth more than that and if I understood it right it was worth around a thousand dollars a share, and he said, well, he would gladly sell all of his, if he could get that for it." "Mr. Kendig told us what poor banking conditions there was, bad credits, etc., the bank had quite a few bad papers and made it difficult to get ahead any."

The only stock Kendig purchased was from Harry Coleman and his mother. Coleman was a director of the bank from the spring of 1933, to the spring of 1937. Coleman testified that the picture he got from Kendig was "the same I got from being a director of the bank, and that $200.00 was all the stock was worth."

Even Gans, who was one of the principal witnesses for the plaintiff, admitted it took him 18 months to

figure out the value of the bank stock. He was very active in the bank's affairs, had charge of its real estate, and was at least assistant manager of the bank from the fall of 1935, immediately after the death of Mr. Brice, to the fall of 1938, when he was relieved of his position by the bank's officers. Gans also testified that there were no financial statements of the borrowers, no abstracts of loans, nor inspection lists of livestock, etc., and no one could tell anything about the value of the loans; that he worked for 18 months trying to compile such records; that he bought his stock from the bank for $200.00 per share, but he figured it was worth $600.00 to $800.00 a share. But he also admitted the bank hadn't made any money from 1933 to 1938, and that the recoveries on old paper charged off, and the sale of real estate that had been taken in on foreclosure, owned by the bank, had gone into the undivided profits account, and balanced out the charge-offs for the last few years.

Mr. Gans also testified that he appeared at their annual meeting, and moved that a 600% dividend be declared, and that he knew if his motion carried, and the directors should follow such a recommendation, that all of the reserves of the bank would be exhausted.

The plaintiff's brief is largely devoted to charges of a conspiracy and concealment, fraud, wrongful or arbitrary abuse of discretionary powers, etc., against these defendants, in not declaring a dividend and in the purchase of different stock certificates throughout 1936 and 1937, and in fact up to 1939. The record discloses that the board of directors' acts for several years between 1935 and 1939 were approved at the annual stockholders' meetings, usually by unanimous vote; also all charge-offs by any officer were approved by the board at a later meeting of the directors.

Also, in speaking of dividends, the dividends that

were paid in 1940 and 1941, after this case was started, were derived from money realized and recovered from the paper charged off and from land sales. These defendants all testified that Mrs. Brice never tried to control or influence their actions on the board; in fact the evidence shows that Josephine Brice did not take a particularly active part in the bank's business, and the managing of the bank was left to Kendig and Toy and Gans. There is no evidence to show that Josephine Brice knew anything about banking. In fact, the evidence is to the contrary. It might be noted also that the plaintiff in this case was one of the judges of the annual stockholders' election in 1941 and admitted voting for all of these defendants for directors, this occurring subsequent to the filing of this law suit.

The different purchases of stock by Mrs. Brice occurred through 1935 to 1937. It appears that at one time, the bank directors were attempting to get Mr. Wageman, a banker of Cheyenne, interested in this bank, and the board of directors authorized the sale of certain stock owned by the bank, and some that they would probably get through foreclosure proceedings, to Mr. Wageman for $100.00 a share, Wageman to put a manager in the bank to run it. The record further discloses that in a number of estates, appraisers appointed by the court in fixing the value of the bank stock, appraised it at from $100.00 to $150.00 a share. In fact, the D. W. Brice estate stock was appraised at $150.00 a share in the estate proceedings, and Josephine Brice, in purchasing stock from different individuals, paid $200.00 a share for the stock, and offered it for the same figure to any satisfactory party that would come in and manage the bank. Some of this bank stock owned by estates, was purchased at public sale under the order of the court and sold by the administrators. Some was purchased by the bank itself, when

it was necessary to foreclose, and some of the stock was purchased when the examiners insisted upon the bank liquidating a loan or charging it off. Some of the stock was purchased from men who had run the bank, had been interested in it for years, as, for instance, Mr. Shick, who was president of the bank for a number of years, and who should have known a great deal about the value of the stock and the bank's assets, not long previous to the time of the sale. In some instances very little, if anything, was said about the purchase and the sale, an offer of $200 was made and no statement was made about the bank's condition, and later the party came back and offered to sell for $200 and was paid that amount. An examination of this record in our minds discloses the absence of any fraudulent representation whatsoever by any defendant. The trial judge heard all the evidence from the witnesses and had a good opportunity to analyze their testimony and demeanor while on the stand. The plaintiff failed to convince him that there had been any fraud or conspiracy practiced by any defendant on anyone whatsoever. The plaintiff admits having received at least 350% in dividends on her stock since she inherited it, in 1927. The bank's policy for more than 25 years prior to the time these defendants became interested in the bank was to maintain large reserves, and it is true they paid splendid dividends at times. In fact, the dividends would average around 25% a year over that period of time.

We do not feel that the facts or the law would warrant us in ordering this board of directors to declare a dividend simply because it has a good sized surplus and reserve, and even a larger reserve than most banks carry. The State Examiners testified that because of the peculiar situation that existed in the Wheatland community, and had for years, they suffered a 10%

larger charge-off than the average bank in Wyoming, and that also because of these conditions mentioned, it was necessary for this bank to carry a much larger surplus and undivided profits account than other banks of like size in the state of Wyoming.

It is our duty, as we see it, to encourage directors in banks to build up their capital structure until it is unassailable. A bank is not an ordinary private corporation in which the stockholders are the only interested parties. The directors in a bank are the trustees of the funds of the whole territory it serves. Nothing can so wreck a community, or cause as much hardship, misery and heartaches, as a bank failure. The community is a great deal more interested in the safety and solvency of a bank than are stockholders who own a small minority interest. It is the sacred duty of all bank directors and officers to protect their depositors first, and their stockholders last. Too many banks throughout Wyoming have failed because they did not build up their capital structure before declaring dividends.

The conditions that face the officers of our banks today are not particularly encouraging, with taxes pyramiding, inflation and its aftermath just around the corner, a world war that is being financed by the United States and its banks, the uncertainties of the war, the disruption of the community's business and social life and its personnel, all add to the worries and uncertainties, and make the decisions of boards of directors in banks arduous and more difficult. It is far better for the directors to be safe rather than sorry.

The decision of the lower court is affirmed.

RINER, Ch. J., and BLUME, J., concur.