**Irma C. CUNDICK, Appellant,**

**v.**

**J. R. BROADBENT, Appellee.**

**No. 8663.**

United States Court of Appeals
Tenth Circuit.

Sept. 14, 1967.

Rehearing Denied Oct. 27, 1967.

John J. Rooney, Cheyenne, Wyo., for appellant.

Edward T. Lazear, of Loomis, Lazear, Wilson & Pickett, Cheyenne, Wyo., for appellee.

Before MURRAH, Chief Judge, and BREITENSTEIN and HILL, Circuit Judges.

MURRAH, Chief Judge.

Irma Cundick, guardian ad litem for her husband, Darwin Cundick, brought this diversity suit in Wyoming to set aside an agreement for the sale of (1) livestock and equipment; (2) shares of stock in a development company; and (3) base range land in Wyoming. The alleged grounds for nullification were that at the time of the transaction Cundick was mentally incompetent to execute the agreement; that Broadbent, knowing of such incompetency, fraudulently represented to Cundick that the purchase price for the property described in the agreement was fair and just and that Cundick relied upon the false representations when he executed the agreement and transferred the property. The complaint further states that the guardian ad litem had offered to restore and does now offer to do so, but Broadbent has refused.

Upon a trial of the case without a jury, Judge Kerr made findings of fact in which he narrated the details of the months-long transaction. Specifically, he found that the various papers and documents embodying the agreement between the parties were prepared by Cundick's counsel and signed by Cundick in the presence of his counsel and his wife with her consent and approval; that the purchase price was paid and the transaction carried out between the date on which the agreement was executed, September 2, 1963, and the middle of February, 1964; that during this time neither Cundick nor his wife ever complained that he was incompetent or mentally incapable of transacting his own affairs, or that he was unable to understand and appreciate the effect of the transaction in which he had participated. He further found that Cundick's conduct during the critical time was the conduct and behavior of a competent person and there was no indication or evidence of any kind that Cundick was defrauded, imposed upon, deceived or overreached; that Cundick's election to rescind the agreement was not made until March, 1964, at which time the contract had been practically carried out; and that the election to rescind was not, therefore, sufficiently prompt.

The court concluded that Cundick failed to sustain the burden of proving that at the time of the transaction he was mentally incapable of managing his affairs; or that Broadbent knew of any mental deficiency when they entered into the agreement; or that Broadbent knowingly overreached him. The appeal is from a judgment dismissing the action. For reasons we shall state, the judgment is affirmed.

The contentions on appeal are twofold and stated alternatively: (1) that at the time of the transaction Cundick was totally incompetent to contract; that the agreement between the parties was therefore void ab initio, hence incapable of ratification; and (2) that in any event Cundick was mentally infirm and Broadbent knowingly overreached him; that the contract was therefore voidable, was not ratified—hence rescindable.

At one time, in this country and in England, it was the law that since a lunatic or non compos mentis had no mind with which to make an agreement, his contract was wholly void and incapable of ratification. But, if his mind

was merely confused or weak so that he knew what he was doing yet was incapable of fully understanding the terms and effect of his agreement, he could indeed contract, but such contract would be voidable at his option. See Dexter v. Hall, 15 Wall. 9, 82 U.S. 9, 21 L.Ed. 73; see also Principles of Contract by Sir Fredrick Pollock, 4th ed. 1888, p. 158. But in recent times courts have tended away from the concept of absolutely void contracts toward the notion that even though a contract be said to be void for lack of capacity to make it, it is nevertheless ratifiable at the instance of the incompetent party. The modern rule, and the weight of authority, seems to be as stated in 2 Jaeger's Williston on Contracts, 3d ed., § 251, in which an Eighth Circuit case is cited and quoted to the effect that " * * * the contractual act by one claiming to be mentally deficient, but not under guardianship, absent fraud, or knowledge of such asserted incapacity by the other contracting party, is not a void act but at most only voidable at the instance of the deficient party; and then only in accordance with certain equitable principles." Rubenstein v. Dr. Pepper Co., 8 Cir., 228 F.2d 528. See also Williston, Secs. 25? and 254.

■ In recognition of different degrees of mental competency the weight of authority seems to hold that mental capacity to contract depends upon whether the allegedly disabled person possessed sufficient reason to enable him to understand the nature and effect of the act in issue. Even average intelligence is not essential to a valid bargain. Williston on Contracts, 2d ed., § 256. In amplification of this principle, it has been said that if a maker of a contract " * * has sufficient mental capacity to retain in his memory without prompting the extent and condition of his property and to comprehend how he is disposing of it and to whom and upon what consideration, then he possesses sufficient mental capacity to execute such instrument." Richard v. Smith, 235 Ark. 752, 361 S.W.2d 741, 742, citing and quoting Donaldson v. Johnson, 235 Ark. 348, 359 S.

W.2d 810, 813; see also Conerly v. Lewis, 238 Miss. 68, 117 So.2d 460; Matthews v. Acacia Mutual Life Insurance Co., Okl., 392 P.2d 369; Berry v. Berry, 269 Ala. 623, 114 So.2d 916. The Wyoming court adheres to the general principle that "Mere weakness of body or mind, or of both, do not constitute what the law regards as mental incompetency sufficient to render a contract voidable. * * * A condition which may be described by a physician as senile dementia may not be insanity in a legal sense." Kaleb v. Modern Woodmen of America, 51 Wyo. 116, 64 P.2d 605, 607. Weakmindedness is, however, highly relevant in determining whether the deficient party was overreached and defrauded. See Williston on Contracts, 3d ed., § 256 and cases collected there.

■ From all this it may be said with reasonable assurance that if Cundick was utterly incapable of knowing the nature and effect of the transaction, the agreement is, without more, invalid, though capable of ratification by his representative or by him during lucid intervals. But, if the degree of disability was such that he was capable of contracting, yet his mental condition rendered him susceptible of being overreached by an unscrupulous superior, his complaint comes under the heading of fraud to be proved as such. The burden is, of course, on the one asserting incompetency and fraud at the crucial time of the making of the challenged agreement.

Cundick was never judicially adjudged incompetent and his guardian ad litem apparently assumes the burden and accepts, as she must, the proposition that if the court's findings are supported by the record, they are conclusively binding here. She meets the issue squarely with the emphatic contention that the findings of the court are utterly without support in the record; that the evidence is all one way to the effect that at the time of the execution of the writings Cundick was mentally incompetent to make a valid contract. But, even if he was legally capable of doing so, she contends the evidence conclusively proves that he was

weak-minded and that Broadbent defrauded him. It is suggested that the court significantly failed to make an affirmative finding on the issue of competency in the face of positive medical expert testimony to the effect that he was mentally incapable of conducting his affairs, particularly the sale and disposition of all his property.

All of the physicians who examined Cundick between 1961 and 1965 testified that in their judgment he was incapable of entering into the contract. When in December, 1960, Cundick first went to his family physician his condition was diagnosed as "depressive psychosis" and he was referred to a psychiatrist in Salt Lake City. While the Salt Lake City physician's report is not in evidence, the family physician apparently was informed by letter that Cundick had been given shock treatments. When Cundick returned to the family physician more than two years later, he was treated for sore throat and bronchitis. From that time until October, 1965, the family physician saw Cundick about 25 times and treated him for everything from a sore throat to a heart attack suffered in March, 1964, but nothing was said or done about a mental condition. Apparently after this suit was filed and upon order of the court Cundick was examined in March, 1964, by two neurosurgeons in Cheyenne. By extensive tests it was established that Cundick was suffering from an atrophy of the frontal lobes of his brain diagnosed as pre-senile or premature arteriosclerosis. Both physicians used different language to say that from their examination in March, 1964, they were of the opinion that on the date of the transaction, i. e. September 2, 1963, Cundick was a "confused and befuddled man with very poor judgment", and although there were things he could do, he was, in their

opinion, unable to handle his affairs at the time of the transaction. A psychologist to whom Cundick was referred in March by the Cheyenne neurosurgeons also testified that in his judgment Cundick was incapable of transacting his important business affairs in September of 1963. There was no medical testimony to the contrary. There was also lay testimony on behalf of Cundick to the effect that he was a quiet, reserved personality; that in approximately 1962 his personality changed from one of friendliness to inattentiveness and that during 1963 he was unable to make decisions with respect to the conduct of his ranching business.

This unimpeached testimony may not be disregarded and the trier of the fact is bound to honor it in the absence of countervailing evidence—expert or non-expert—upon which to rest a contrary finding. "But, expert evidence does not foreclose lay testimony concerning the same matter which is within the knowledge and comprehension of the lay witness. A lay witness may tell all he knows about a matter in issue even though it may tend to impugn the conclusions of the expert." Stafos v. Missouri Pacific Railroad Company, 10 Cir., 367 F.2d 314, 317, and cases cited. The trier of the fact is not concluded by expert proof if other facts and circumstances of the case tend to cast doubt on its credibility. See Perlmutter v. C.I.R., 10 Cir., 373 F.2d 45, and cases cited; and see also Dayton P. & L. Co. v. Public Utilities Comm., 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. It has even been said that opinion evidence in cases of this kind is "* * * generally considered low grade, and not entitled to much weight against positive testimony of actual facts". See In re Meyers, 410 Pa. 455, 189 A.2d 852, 860.[1] The nature

---

1. In the comprehensive opinion in the Meyers case the Supreme Court of Pennsylvania recognized at p. 862 three classes of testimony in determining mental competency, "(1) the testimony of those who observed the speech and conduct of the person on the day of execution of the instrument whose validity is challenged; (2) the testimony of those who observed the speech and conduct of the person a reasonable time before and after the day of execution of the instrument; (3) the testimony of those who never observed the speech and conduct of the

and circumstances of the transaction are certainly relevant evidence of the capacity of the parties to contract. The trial judge who heard and saw the witnesses and felt the pulse beat of the lawsuit is, to be sure, the first and best judge of the weight and value to be given to all of the evidence, both expert and non-expert.

Against the background of medical and lay evidence tending to show Cundick's incompetency on the crucial date, there is positive evidence to the effect that at the time in question he was 59 years old, married and operating a sheep ranch in Wyoming; that in previous years he had sold his lamb crop to Broadbent and on a date prior to this transaction the parties met at a midway point for the purpose of selling the current lamb crop. Although there is innuendo concerning what transpired at the meeting, neither party testified and no one else was present. We do know that the meeting resulted in a one page contract signed by both parties in which Cundick agreed to sell all of his ranching properties to Broadbent. It is undisputed that Cundick and his wife thereafter took this one page contract to their lawyer in Salt Lake City who refined and amplified it into an eleven page contract providing in detail the terms by which the sale was to be consummated. The contract was signed in the lawyer's office by Cundick and Broadbent in the presence of Cundick's wife and the lawyer. The lawyer testified that the contract had been explained in detail and that all parties apparently understood it.

Thereafter and on September 23, pursuant to the terms of the contract Cundick and Broadbent met at the Cundick ranch and the lamb crop was delivered to Broadbent who in turn delivered them to another purchaser. All of the arrangements for the delivery of the lamb crop were made by Cundick, and he and Broadbent worked the scales together and tallied the weights. Later, and on October 4, 1963, Cundick wrote to Broadbent notifying him that he was ready to deliver the remainder of the sheep on October 10. This date was unsatisfactory to Broadbent and the parties agreed to a postponement until October 17, Broadbent agreeing to pay all of the expenses caused by the delay. The parties met at the Cundick corral, as agreed, on October 17. Cundick and Broadbent, aided by their ranch hands, mouthed, separated, checked and counted the ewes according to age. Cundick participated in this operation and no one seemed to notice anything unusual about him, except that in the process of mouthing the sheep Cundick missed a number of the old ewes placing them with the young to his advantage.

Cundick's lawyer who drafted the contract testified concerning an office memorandum dated October 18 which recited that Mrs. Cundick had called him that day saying the sheep had been delivered and that Broadbent had made part payment on account of the contract including a check for the expenses incurred by Cundick due to the delay in taking delivery of the sheep. The memorandum recited that Broadbent had offered to call off the whole deal but that Cundick had refused.[2] The office memorandum fur-

---

person. In the first two classes, every witness, whether lay or expert, recites what he or she observed and then draws from the observation of such behavior an inference as to competency or incompetency which is called an opinion. In the last class, the inference is drawn after reading or hearing someone's recital of the person's speech and conduct, reliance being placed not on the observations of the witness but on the observations of another party. Obviously, the last class of testimony is not entitled to much weight." See also Cyrus v. Tharp, 147 W.Va. 110, 126 S.E.2d 31.

2. There was corroborated testimony that while the sheep were being "shaped up" and delivered, Mrs. Cundick was heard to say to Broadbent that "she didn't like the deal", and that Broadbent replied "Up to this point no one is hurt, the outfit is intact and if you don't like it you can have it." Mrs. Cundick then said " * * * A deal [is] a deal and we can go along with it." Curiously enough neither Broadbent nor Mrs. Cundick took

ther stated that Broadbent had given Cundick a signed memo providing "1. Cundick will waive interest on balance of amount due on contract for one year and Broadbent will add $5 per acre on the land. 2. Any income from oil or gas royalties, or leases or private lands, or oil and gas, or minerals will be paid to seller." The office memorandum went on to state the increase in the sale price resulting from this modification.[3] Thereafter Mr. and Mrs. Cundick took the memo to their lawyer and he prepared a supplemental agreement covering the changes reflected in the memo. This supplemental agreement was signed in the lawyer's office on October 24 after discussion between the parties. Thereafter and between October 24 and February, 1964, Cundick signed and delivered all the instruments including assignments, receipts and proxies necessary to fully complete the transactions in accordance with the contract as amended.

█ As we have seen Cundick was not treated nor did he consult a physician for his mental condition from the time he returned from Salt Lake City in early 1961, until he was examined apparently by order of the court in March, 1964, after this suit was commenced. There was, to be sure, evidence of a change in his personality and attitude toward his business affairs during this period. But the record is conspicuously silent concerning any discussion of his mental condition among his family and friends in the community where he lived and operated his ranch. Certainly, the record is barren of any discussion or comment in Broadbent's presence. It seems incredible that Cundick could have been utterly incapable of transacting his business af-

fairs, yet such condition be unknown on this record to his family and friends, especially his wife who lived and worked with him and participated in the months-long transaction which she now contends was frauduently conceived and perpetrated. All this record silence, together with the affirmative evidence of normal behavior during the period of the transaction speaks loudly in support of the court's finding that Cundick's acts " * * * were the acts, conduct and behavior of a person competent to manage his affairs * * *." As applied to the critical issue of incompetency, this finding leads us to the conclusion reached by the trial judge that when the medical testimony, positive as it may be, is considered in the context of all that was said and done, it does not carry the heavy burden of proving that Cundick was incompetent, i. e. he did not know the extent and condition of his property, how he was disposing of it, to whom and upon what consideration.

█ The narrated facts of this case amply support the trial court's finding to the effect that Broadbent did not deceive or overreach Cundick. In the absence of any evidence that Broadbent knew of Cundick's mental deficiency, the only evidence from which it can be said that Broadbent took advantage or overreached him is the proof concerning the value of the property sold under the contract. As to that, there is positive evidence that the property was worth very much more than what Broadbent paid for it. But as we have noted, there was evidence to the effect that after the original contract was signed and some complaint made about the purchase price, the parties agreed to raise the price and the

the stand to testify in this case. But it was stipulated that if she testified she would deny that "an offer was made to rescind the full contract"; that instead "the offer was to rescind that portion of the contract which had to do with the base lands only * * *." It was also stipulated that if Broadbent took the stand he would tesify that "the offer was made."

3. Trial counsel objected to the Salt Lake City lawyer's reading from this memo and "other notes and data" contained in his files. But there is nothing in these files, notes and data in the form of a communication which could properly be the subject of a confidential disclosure. See Wilcoxon v. United States, 10 Cir., 231 F.2d 384.

contract was so modified. The trial court found that the contract was supported by adequate consideration and specifically that the price paid for the shares of stock in the development company far exceeded the amount for which it sold from 1957 to 1962. It is suggested that fraudulent implications should be drawn from the fact that a substantial dividend was paid to the shareholders of the development company within a year from the date of the subject transaction; that as a director Broadbent had knowledge of a corporate transaction which contributed at least in part to the dividend and that Cundick had no such knowledge. But, there is nothing on this record from which it can be said with assurance that Broadbent possessed any knowledge of corporate affairs or transactions which was unavailable to Cundick or any other shareholder. Moreover, under applicable Wyoming law, a director does not stand in a fiducial relationship to a shareholder with regard to his stock. He has a right to purchase a shareholder's stock, and mere failure on the part of the director to disclose inside information does not compel an inference of fraud. See Morrison v. State Bank of Wheatland, 58 Wyo. 138, 126 P.2d 793; But Cf. Blazer v. Black, 10 Cir., 196 F.2d 139.

■ The Court finally concluded that the contract as amended was not unconscionable, unfair or inequitable. From the whole record we cannot say its conclusions in that respect are unsupported by the evidence. In this view of the case we have no occasion to consider whether the contract, if voidable, was in fact ratified.

Affirmed.

HILL, Circuit Judge (dissenting):

I am compelled to disagree with my distinguished associates. A careful review of the entire record before us leaves me with a firm and definite conviction that not only has a mistake been made by the very able trial judge but it is my feeling that a gross miscarriage of justice has taken place.

The evidence relied upon by the trial court and by the majority is actually trivial and inconsequential as compared with the undisputed medical testimony in the record as to the mental competency of Cundick to comprehend and understand the nature of the transactions in which he was involved.

Viewing all of the evidence adduced by appellee in a light most favorable to him, I cannot say that it meets the test of substantial evidence and I must conclude that it actually has little or no probative value. Much of this evidence pertains to the "mouthing" or separating of sheep by Cundick in the consummation of the deal. Five witnesses testified about this matter. One such witness admitted he did not have an opportunity to observe Cundick's ability to handle detailed business transactions. Another testified about mistakes made by Cundick in performing this simple "mouthing" operation. To me, none of this evidence even vaguely approaches the crucial issue of mental competency. Another Broadbent witness, an 89 year old lawyer from Evanston, Wyoming, admitted he "didn't have any occasion to make any observation about Cundick's ability to conduct his own business." The concluding evidence on behalf of Broadbent came from the deposition of lawyer Mark, who had prepared the legal documents in connection with the transaction in question. The fact that Mark testified only by deposition precludes the application of the rule that because of the trial judge's opportunity to observe and hear a witness personally testify, he is in a much better position to evaluate such testimony than is an appellate court. In this case, so far as the testimony of Mark is concerned, we are on an equal footing with the trial court and free to make our own independent evaluation. Mark was not asked to express his opinion as to the mental competency of Cundick. From all four corners of Mark's deposition it

is plain that Mrs. Cundick, not Mr. Cundick, was the one actively participating in the conferences with Mark, and the one who was actually handling the consummation of the sale to Broadbent. What little participation is shown by Mr. Cundick was only through the guiding hand of Mrs. Cundick or Mark. This conclusion goes also to every act shown by the evidence to have been performed by Cundick in furtherance of the sale.

The one page longhand written agreement between Cundick and Broadbent was undisputedly written by Broadbent with only the two contracting parties present. It is significant to me that after every event that transpired in performance of the contract to sell, Cundick was relying upon another person for directions as to what he should do.

Both the trial court and my brothers seem to put some stress upon Mrs. Cundick's participation in the transaction. To me, what she did or said is immaterial. She is actually a stranger to the transaction and her mental competency and understanding of the import of what was taking place cannot be a substitute for the required mental competency and understanding on the part of Mr. Cundick. The same may be said as to the materiality and importance of the testimony of lawyer Mark.

The trial court made no specific finding as to the mental competency of Cundick as of the date of the contract but did find generally "The acts and conduct of Cundick between September 2, 1963, and the middle of February, 1964, were the acts, conduct and behavior of a person competent to manage his affairs and cognizant of the effect of his actions." To me, there is no evidence in the record to support this sweeping finding. The evidence, as I have pointed out, shows without contradiction that during the above period of time every pertinent act by Cundick was performed under the guiding hand of either his wife, his lawyer or some other person.

The opinion of the majority accurately reflects the expert testimony adduced by appellant on the issue of the mental competency of Cundick to make the questioned contract. It was positive, convincing and undisputed. Under the law of this Circuit the trial judge was compelled to honor it.[1] Upon his failure to follow these cases, we should reverse.

Finally, on the question of whether Broadbent, in a legal sense, overreached Cundick, the evidence is uncontradicted that he did.

The evidence as to the true value of the property covered by the contract is uncontroverted. The 2252 acres of land involved sold for $39,510.00. A qualified expert on land values in the vicinity fixed the value at $86,189.00. Cundick's interest in Uinta Development Company sold for $46,750.00. Witness Spaulding for appellee testified this interest had a value of $73,743.45 and the three witnesses for appellant valued it at $184,358.63, $105,491.38 and $184,358.63. It is noteworthy that within a year after the date of the contract a dividend of $20,000.00 became payable upon Cundick's interest in the company and that Broadbent was one of the directors of Uinta on the date of the contract of sale and was in a position to have special knowledge about the company affairs and the value of its stocks.

It is well recognized by the authorities that transactions by a person of weak understanding are subject to close scrutiny. This principle recognizes the fact that advantage could quite easily be taken of such people. Therefore, evidence of weakness of mind and circumstances showing unfair dealing and inadequacy of consideration may present a situation

---

1. Stafos v. Missouri Pacific Ry. Co., 10 Cir., 367 F.2d 314; Browning v. Crouse, 10 Cir., 356 F.2d 178, cert. denied, 384 U.S. 973, 86 S.Ct. 1864, 16 L.Ed.2d 683; Potucek v. Cordeleria Lourdes, 10 Cir., 310 F.2d 527, cert. denied, 372 U.S. 930, 83 S.Ct. 875, 9 L.Ed.2d 734; Nicholas v. Davis, 10 Cir., 204 F.2d 200.

where transactions taken should be rescinded. Williston, Contracts, § 256; 23 Am.Jur., Fraud and Deceit, § 15; 17 C.J.S. Contracts § 133(1). The majority recognizes this principle but does not, I feel, apply it to this case. It has been clearly established here that even if Cundick was not incompetent he was in a weakened mental condition. The gross inadequacy of the consideration was set out above. These factors clearly establish the basis for the application of the above principle. A strikingly similar case occurred in Colorado where an elderly rancher was persuaded by a person with whom he had had frequent livestock transactions to sell his ranch and cattle, having a worth of approximately $20,000.00, for about $8,000.00. Although the trial court found, on the basis of psychiatric evidence taken after the sale, that the rancher was incompetent, an alternative basis for the decision was: "Even though a mental condition may not amount to legal insanity, it may be sufficient to result in an inequality between the parties properly to be considered in connection with circumstances of unfair dealing and inadequacy of the consideration in determining whether a transaction vitiated by fraud, either actual or constructive." Ruffini v. Avara, 121 Colo. 567, 220 P.2d 355 at 358. It is significant to note that no mention was made of whether the purchasers had any knowledge of the seller's lack of capacity. The court felt that "the circumstances [of the sale] in themselves would seem to indicate a lack of capacity to manage property * * *." Ibid. I believe the instant case fits within the above quoted principle.

It is inconceivable to me that any mentally competent person, with a lifetime of experience as a successful and substantial rancher and stockman, would dispose of his ranch interests at a price equal to less than one-half of the actual value. I would reverse and direct the entry of judgment in favor of appellant as prayed for.